# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROLINE HERRON )<br><br>  Plaintiff, )<br><br>  v. )<br><br>FANNIE MAE, *et al.*, )<br><br>  Defendants. ) | Civil Action No. 1:10-CV-00943-RMC |

## PLAINTIFF'S OBJECTIONS AND RESPONSES
## TO FIRST SET OF INTERROGATORIES
## FROM DEFENDANT FANNIE MAE TO PLAINTIFF CAROLINE HERRON

Plaintiff Caroline Herron, through undersigned counsel, and pursuant to Rule 33, Fed. R.

Civ. P., hereby provides her Objections and Responses to the First Set of Interrogatories from

Defendant Fannie Mae to Plaintiff Caroline Herron.

### GENERAL OBJECTIONS

Plaintiff objects to defendants' interrogatories insofar as they:

(a)     Request information or identification of documents related to confidential

communications between Plaintiff and her attorneys, on the grounds that the information sought

is protected under the attorney-client privilege;

(b)     Request information or identification of documents prepared by Plaintiff's

counsel for their own use, or by Plaintiff or Plaintiff's witnesses for use by Plaintiff's counsel, on

the grounds that the information sought is protected from disclosure by the attorney work-

product doctrine;

(c)     Seek to enlarge Plaintiff's obligation to respond to discovery beyond the

obligations established by the Federal Rules of Civil Procedure; or

(d)     Seek discovery from Plaintiff of records and documents that are in the possession, custody, or control of individuals and entities other than Plaintiff.

Plaintiff has made a diligent and reasonable search and inquiry for the information requested by the interrogatories. Any response contained herein, however, is given with the understanding that Plaintiff and Plaintiff's attorneys are still conducting discovery and investigation in connection with this action. Plaintiff's responses are therefore without waiver of, or prejudice to, her right to later use additional information not set forth or referred to in this response. In addition, any response contained herein is made with the express reservation of all rights pursuant to the Federal Rules of Civil Procedure to supplement or amend these responses or to present evidence either discovered subsequent to the date hereof, or the significance of which is later discovered.

The above-stated General Objections are hereby incorporated in each of Plaintiff's following responses to specific interrogatories, whether or not expressly repeated in response to a particular request.

## RESPONSES

INTERROGATORY NO. 1:

In the Complaint and in plaintiff's Briefs, you accuse Defendants of making misrepresentations and false or fraudulent statements to the government (including Treasury), deliberately concealing information from the government (including Treasury), as well as taking illegal actions and conduct, to wit (and as underscored below) –

--     In the Complaint at Paragraph 92, it is alleged that:

Defendant Fannie Mae's actions described above were taken in willful and wanton disregard of Ms. Herron's rights, and were taken in order specifically to injure her for her refusal to condone and participate in Fannie Mae's illegal actions.

--     In the Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss ("Opposition") at 2, it is alleged that:

This case arises from defendants' termination of Ms. Herron because she disclosed to the U.S. Department of the Treasury ("Treasury"), and protested within Fannie Mae, that Fannie Mae was engaging in a gross waste of public funds and violating its statutory obligation by making false and misleading statements to Treasury, and refusing to comply with Treasury's directives, Fannie Mae took these illegal actions so that it could get paid incentives for work done that was not in the best interests of Treasury and the taxpayers, and to make Fannie Mae look good at a time when Treasury was expected to decide its fate.

--      In the Opposition at 25, it is alleged:

The Major Fraud Act embodies the public policy underlying Ms. Herron's wrongful termination claim, since she pled that Fannie Mae fired her after she disclosed that Fannie Mae made false or fraudulent representations to Treasury about its work on the TARP contract.

--      In the Opposition at 25, it is alleged that:

Similarly, defendants violated the public policy underlying the criminal prohibition on making false statements to the government, i.e., concealing or covering up of "a material fact" and the making of "any materially false, fictitious, or fraudulent statement or representation" to the government. See 18 U.S.C. § 1001(a). The false statements statute embodies the public policy underlying Ms. Herron's wrongful termination claim, since she pled that Fannie Mae fired her after she disclosed to Treasury that Fannie Mae was deliberately concealing information from Treasury about Fannie Mae's operations, at the expense of the government.

--      In the Opposition at 39, it is alleged that:

. . .defendants were instead acting contrary to those interests by misrepresenting to Treasury the progress that Fannie Mae was making on the loan modifications, so that Fannie Mae could get paid under its Contract [as defined and used in the Operation] with Treasury.

--      In Plaintiff's Surreply Brief at 8, it is alleged:

Instead, Ms. Herron can rely upon the statutes and regulations identified in her Complaint and in her Opposition as sources of the public policy for her wrongful termination claim. She need only show that these statutes and regulations embody a public policy against illegal conduct - gross waste of taxpayer funds, and misrepresentations to the federal government – and that defendants terminated her in retaliation for her disclosures of this conduct.

For each instance as underscored above as to which you make an accusation or allegation that Defendants made misrepresentation and false or fraudulent statements to the government (including Treasury), deliberately concealed information from the government (including

3

Treasury), or took illegal actions and conduct (collectively the "false statements, misrepresentation an illegal conduct"), identify: the person(s) making/taking such false statements, misrepresentations and illegal conduct; the person(s) to whom were made, or against whom were taken, such false statements, misrepresentations and illegal conduct; when specifically the person(s) made or against whom they took such false statements, misrepresentation and illegal; conduct; and further identify or otherwise explain and describe with particularity what were the specific false statements, misrepresentations and illegal conduct, made/taken and the circumstances giving rise to them *(i.e.,* how they arose or came about.

RESPONSE TO INTERROGATORY NO. 1:

Object on the ground that this interrogatory is overbroad, not limited to the subject matter of this litigation, and not reasonably calculated to lead to the discovery of admissible information, since this discovery is only relevant to a claim under the False Claims Act, which Ms. Herron has not pled. Further object on the ground that this interrogatory seeks information that is in the possession, custody, or control of individuals and entities other than Plaintiff. Subject to and without waiving these objections, Ms. Herron responds as follows.

Ms. Herron does not have knowledge of specific false claims or invoices presented to Treasury, or of the identity of the specific persons who prepared, reviewed, or submitted those false claims or invoices. Ms. Herron believes that the following false or misleading information was provided to Treasury about Fannie Mae's work on the Second Lien Modification Program, FHA-HAMP and the Borrower Portal:

1.    Fannie Mae had significant issues in developing and producing accounting and performance reports for Treasury from the IR2 database that was the system of record for the MHA program and contained all of the data related to trial modifications, permanent modifications, and incentive payments in the summer and fall of 2009. These issues were regularly discussed in the 8:30 am management meetings at Fannie Mae, but much of this information was kept from Treasury. At one point Fannie Mae staff were complaining about

4

how many questions Treasury was asking, because Treasury did not understand the complexity of the data or the reporting technology, and Treasury staff were concerned about any issue they found in the reports. Ms. Herron started asking simple questions at the 8:30 am meetings to the effect that "Well, Treasury is our client for this program so don't we provide incident reports when we experience a technical issue or data issue that explains what the problem is, what impact it has had, what is the root cause, how we will fix it and when, and what work-arounds are in place until it is fixed?" Ms. Herron also started pointing out to the effect that "We provided that kind of information to lenders that used Fannie software since it could impact their business and they were paying for these services." However, Fannie was not providing such incident reports to Treasury, and did not do so until the late Fall 2009 for issues deemed significant. During the same meeting that Ms. Herron asked if Fannie provided incident reports to Treasury, another person suggested that Fannie Mae invite a Treasury representative to attend the 8:30 management meetings, since they were all about MHA projects and their status, issues, technology development and issues, policy development and issues, and related topics. However, the majority of attendees at this meeting (including Eric Schuppenhauer, Marcel Bryar - PMO, Malloy Evans - Legal, Ron Rohrbach – Technology, and Kendra Meeks - operations) responded negatively, and rejected this recommendation.

      2.     For the borrower portal, Fannie Mae staff (including Eric Schuppenhauer and Joy Cianci) stated their opposition to this project in all internal meetings, and they thought that the marketplace should provide electronic document services. Joy Cianci suggested that Ms. Herron start working on the portal project so that Ms. Herron could take the lead in persuading Treasury to Fannie Mae's point of view. This caused delays in development of a portal until the FHFA eventually shut down this project. Fannie Mae staff (Jeff Hayward – SVP, Beverly Wilbourn –

VP and Alanna Scott Brown) also refused to integrate Fannie Mae's Home Counselor Online application, which was used by counselors working with borrowers in financial trouble to modify loans, with the HopeNow counselor portal. All other counseling software had been or was scheduled to be integrated with HopeNow's portal.

3.      When Treasury wanted to change how Fannie Mae would apply the 2MP borrower incentive on their own Fannie Mae loans, Eric Schuppenhauer knew that it was going to add complexity and cost to developing the technology and operating the program. However, he simply wanted Ms. Herron to tell Treasury that it was possible for Fannie to do it, and let Treasury make the final decision. Based on Ms. Herron's side discussions with Treasury staff on costs and other legal issues that Treasury identified, Treasury dropped the proposal and let Fannie Mae keep their program as is and simplified their own program.

4.      Eric Schuppenhauer and Marcel Bryar specifically told Ms. Herron not to provide project budgets to FHFA or Treasury for the borrower portal and FHA-HAMP projects, despite both agencies asking for them in late 2009, because Fannie Mae was in the middle of re-negotiating its Financial Agency Agreement contract and budget with Treasury and did not want these numbers to affect that process.

5.      At that same time that Eric Schuppenhauer would not let Ms. Herron produce and share project budgets, he also forbade her from talking directly to FHFA about the FHA-HAMP program. FHFA was resistant to Fannie Mae and Freddie Mac working on this program because it involved the loans of another government agency (FHA). Ms. Herron was working with FHFA to make sure they understood exactly what Fannie Mae and Freddie Mac would be responsible for, so they could make an informed decision. When Ms. Herron tried to move the process along, and replied to an email from FHFA that also included Fannie Mae and Treasury

staff, and she wrote that the best approach may be to sit down together and hash this out, Eric

Schuppenhauer told Marcel Bryar and Alanna Scott Brown that Ms. Herron was no longer

permitted to speak to FHFA unless her talking points were cleared by Mr. Bryar and other

Fannie Mae staff were included.  Mr. Schuppenhauer did not want FHFA to think that Fannie

Mae staff was in anyway pressuring them to make a decision on Fannie Mae's role in the FHA-

HAMP program.

6.      Alanna Scott Brown resisted Ms. Herron's attempts to bring all parties together

(Fannie Mae, Freddie Mac, Treasury, and FHFA) in one meeting to review MHA policy issues

identified by servicers.  Ms. Brown's staff thought it was a good idea, but Ms. Brown wanted to

keep Fannie Mae discussions separate from Treasury and the other parties.  This resulted in

delays in resolving policy issues and granting waivers.  Similarly, the Fannie Mae Servicer

Integration teams had weekly meetings with the large servicers (i.e., Bank of America, Citi,

GMAC, JP Morgan Chase, Wells Fargo, and perhaps others) to discuss MHA program policy,

rollouts and technology details, dates and issues.  Meticulous notes were kept by either the

servicer or Fannie Mae staff which included all issues and their status or resolution.  Many of

these issues stayed open week after week because Fannie Mae staff was not following up

appropriately or blamed Treasury for being slow in making a decision.  Ms. Herron does not

believe that these detailed reports were ever shared with Treasury.  Many of these issues later got

escalated during the resource-intensive conversion campaign in December 2009 and January

2010.  Due to Treasury pressure to increase the conversion rate of trial modifications to

permanent modifications, Fannie Mae finally set up a system where all policy issues were

tracked centrally and resolved expeditiously via a joint organizational conference call.

7.      By the late fall of 2009, there were numerous program issues (particularly low

conversion rates, lots of programs under development with changing policies) that Fannie Mae

started having executive level intra-organizational meetings with Mike Williams and Eric

Schuppenhauer from Fannie Mae, Herb Allison and (perhaps) Michael Barr from Treasury, the

CEO of Freddie Mac, and Ed DeMarco from FHFA.  Ms. Herron and her colleagues had to

generate status reports that Marcel Bryar's team would consolidate and revise for briefing Mr.

Williams.  Upon information and belief, Mr. Bryar, Mr. Schuppenhauer, and Mr. Williams, in

turn, would attempt to put the best possible spin on these status reports in his communications

with Treasury about the program.

INTERROGATORY NO. 2:

In the Complaint at Paragraph 11, you allege, *inter alia*: "Ms. Herron worked on some of the most critical projects at Fannie Mae, and assumed a leadership position in several key areas, including projects directly overseen by Treasury." Explain or otherwise describe in detail the leadership position that you allegedly assumed, and identify the "key areas, including [the] projected directly overseen by Treasury" including the person(s) at Fannie Mae and Treasury overseeing such key areas and projects, as referenced in Paragraph 11.

RESPONSE TO INTERROGATORY NO. 2:

Ms. Herron was the Product Manager for the Second Lien Modification Program, FHA-

HAMP and the Borrower Portal.  The Product Manager was the Fannie Mae staffer responsible

overall for specific Treasury programs including the following key areas and leadership

positions:

1.     Serving as the Fannie Mae representative on these projects to Treasury, other

Federal agencies (including the Federal Housing Finance Agency, Federal Housing

Administration, Office of the Comptroller of the Currency, and Freddie Mac), vendors (including

but not limited to, Aligent, Apple, Default Mitigation Management, HopeNow, IndiSoft LLC,

and LPS Analytics), and servicers (including but not limited to, American Home Mortgage, Bank

of America, Banco Popular de Puerto Rico, CitiMortgage, Flagstar Bank, GMAC Mortgage

_Caroline R. Herron_ (signature)

Caroline R. Herron

Subscribed and sworn to before me,
this __4__ day of April 2011.

_Antonio Maff_ (signature)

Notary Public

My commission expires ___**My Commission Expires June 30, 2015**___

AS TO OBJECTIONS:

_Alan R. Kabat_ (signature)

Lynne Bernabei (D.C. Bar No. 938936)
Alan R. Kabat (D.C. Bar No. 464258)
BERNABEI & WACHTEL, PLLC
1775 T Street, N.W.
Washington, D.C. 20009-7124
tel. (202) 745-1942
fax (202) 745-2627
Bernabei@BernabeiPLLC.com
Kabat@BernabeiPLLC.com

*Counsel for Plaintiff Caroline Herron*

DATED: April 4, 2011