## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CAROLINE HERRON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:10-CV-00943-RMC** |
| | ) | |
| **FANNIE MAE**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

### DECLARATION OF ALAN R. KABAT

I, Alan R. Kabat, this 28th day of July 2011, declare and state as follows:

1.      This declaration is based on my personal knowledge.  I am over eighteen years of age, and am competent to testify to the matters stated below.  I am submitting this declaration in support of Plaintiff's Motion for Judicial Notice of Documents Cited in Plaintiff's Opposition to Motions to Dismiss.

2.      The document attached hereto as Exhibit 1 is a true and correct copy of the Emergency Order issued by the U.S. Securities and Exchange Commission, and publicly posted on its website.  See SEC, Release No. 58166, "Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments" (July 15, 2008) (online at: http://www.sec.gov/rules/other/2008/34-58166.pdf) (viewed July 25, 2011).

3.      The document attached hereto as Exhibit 2 is a true and correct copy of excerpts from the memoirs of President George W. Bush, *Decision Points* (2010).

4.     The document attached hereto as Exhibit 3 is a true and correct copy of excerpts from the memoirs of Secretary of the Treasury Hank Paulson, *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System* (2010).

I declare this 28th day of July 2011, subject to the pain and penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

_____
ALAN R. KABAT

**Exhibit 1**


SEC, Release No. 58166,
"Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking
Temporary Action to Respond to Market Developments" (July 15, 2008)
(online at: http://www.sec.gov/rules/other/2008/34-58166.pdf) (viewed July 25, 2011).

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
RELEASE NO. 58166 / July 15, 2008

EMERGENCY ORDER PURSUANT TO SECTION 12(k)(2) OF THE SECURITIES
EXCHANGE ACT OF 1934 TAKING TEMPORARY ACTION TO RESPOND TO
MARKET DEVELOPMENTS

False rumors can lead to a loss of confidence in our markets.  Such loss of

confidence can lead to panic selling, which may be further exacerbated by "naked" short

selling.  As a result, the prices of securities may artificially and unnecessarily decline

well below the price level that would have resulted from the normal price discovery

process.  If significant financial institutions are involved, this chain of events can threaten

disruption of our markets.

The events preceding the sale of The Bear Stearns Companies Inc. are illustrative

of the market impact of rumors.  During the week of March 10, 2008, rumors spread

about liquidity problems at Bear Stearns, which eroded investor confidence in the firm.

As Bear Stearns' stock price fell, its counterparties became concerned, and a crisis of

confidence occurred late in the week.  In particular, counterparties to Bear Stearns were

unwilling to make secured funding available to Bear Stearns on customary terms.   In

light of the potentially systemic consequences of a failure of Bear Stearns, the Federal

Reserve took emergency action.

The Commission has taken a series of actions to address concerns about rumors.

For example, in April, 2008, we charged Paul S. Berliner, a trader, with securities fraud

and market manipulation for intentionally disseminating a false rumor concerning The

Blackstone Group's acquisition of Alliance Data Systems Corp ("ADS").  The

Commission alleged that this false rumor caused the price of ADS stock to plummet, and that Berliner profited by short selling ADS stock and covering those sales as the false rumor caused the price of ADS stock to fall.  See http://www.sec.gov/litigation/litreleases/2008/lr20537.htm.

As another example, on July 13, 2008, the Commission announced that the SEC and other securities regulators would immediately conduct examinations aimed at the prevention of the intentional spreading of false information intended to manipulate securities prices.  The examinations will be conducted by the SEC's Office of Compliance Inspections and Examinations, as well as the Financial Industry Regulatory Authority, Inc. and New York Stock Exchange Regulation, Inc.  See http://www.sec.gov/news/press/2008/2008-140.htm.

We intend these and similar actions to provide powerful disincentives to those who might otherwise engage in illegal market manipulation through the dissemination of false rumors and thereby over time to diminish the effect of these activities on our markets.  In recent days, however, false rumors have continued to threaten significant market disruption.  For example, press reports have described rumors regarding the unwillingness of key counterparties to deal with certain financial institutions.  There also have been rumors that financial institutions are facing liquidity problems.

As a result of these recent developments, the Commission has concluded that there now exists a substantial threat of sudden and excessive fluctuations of securities prices generally and disruption in the functioning of the securities markets that could threaten fair and orderly markets.  Based on this conclusion, the Commission is

exercising its powers under Section 12(k)(2) of the Securities Exchange Act of 1934.[1]

Pursuant to Section 12(k)(2), in appropriate circumstances the Commission may issue

summarily an order to alter, supplement, suspend, or impose requirements or restrictions

with respect to matters or actions subject to regulation by the Commission.

In these unusual and extraordinary circumstances, we have concluded that

requiring all persons to borrow or arrange to borrow the securities identified in Appendix

A prior to effecting an order for a short sale of those securities is in the public interest and

for the protection of investors to maintain fair and orderly securities markets, and to

prevent substantial disruption in the securities markets.  This emergency requirement will

eliminate any possibility that naked short selling may contribute to the disruption of

markets in these securities.  We described in the releases in which we proposed and

adopted Regulation SHO the bases for the current requirements Regulation SHO

imposes.  We believe, however, that the unusual circumstances we now confront require

the temporarily enhanced requirements we are imposing today.

IT IS ORDERED that, pursuant to our Section 12(k)(2) powers, in connection

with transactions in the publicly traded securities of substantial financial firms, which

entities are identified in Appendix A, no person may effect a short sale[2] in these

securities using the means or instrumentalities of interstate commerce unless such person

or its agent has borrowed or arranged to borrow the security or otherwise has the security

---

[1] This finding of an "emergency" is solely for purposes of Section 12(k)(2) of the Exchange Act and is not
intended to have any other effect or meaning or to confer any right or impose any obligation other than set
forth in this Order.

[2] The definition of "short sale" shall be the same definition used in Rule 200(a) of Regulation SHO and the
requirements for marking orders "long" or "short" shall be the same as provided in Regulation SHO.

available to borrow in its inventory prior to effecting such short sale and delivers the security on settlement date.[3]

In order to allow market participants time to adjust their operations to implement the enhanced requirements, this Order shall take effect at 12:01 a.m. EDT on Monday, July 21, 2008.  This Order shall terminate at 11:59 p.m. EDT on Tuesday, July 29, 2008 unless further extended by the Commission.

By the Commission.


Florence E. Harmon
Acting Secretary

---

[3] Short sales to be effected as a result of a put options exercise are subject to this Order.  In addition, we note that short sales used to hedge would also be subject to this Order.

**Appendix A**

| Company | Ticker Symbol(s) |
|---|---|
| BNP Paribas Securities Corp. | BNPQF or BNPQY |
| Bank of America Corporation | BAC |
| Barclays PLC | BCS |
| Citigroup Inc. | C |
| Credit Suisse Group | CS |
| Daiwa Securities Group Inc. | DSECY |
| Deutsche Bank Group AG | DB |
| Allianz SE | AZ |
| Goldman, Sachs Group Inc | GS |
| Royal Bank ADS | RBS |
| HSBC Holdings PLC ADS | HBC and HSI |
| J. P. Morgan Chase & Co. | JPM |
| Lehman Brothers Holdings Inc. | LEH |
| Merrill Lynch & Co., Inc. | MER |
| Mizuho Financial Group, Inc. | MFG |
| Morgan Stanley | MS |
| UBS AG | UBS |
| Freddie Mac | FRE |
| Fannie Mae | FNM |

**Exhibit 2**

George W. Bush, *Decision Points* (2010) (excerpts).

# DECISION POINTS

# GEORGE W. BUSH



CROWN PUBLISHERS

*New York*

CH 3198

Many in Washington denounced the move as a bailout. It probably didn't feel that way to the Bear employees who lost their jobs or the shareholders who saw their stock drop 97 percent in less than two weeks. Our objective was not to reward the bad decisions of Bear Stearns. It was to safeguard the American people from a severe economic hit. For five months, it looked like we had.

---

"Do they know it's coming, Hank?"

"Mr. President," he replied, "we're going to move quickly and take them by surprise. The first sound they'll hear is their heads hitting the floor."

It was the first week of September 2008, and Hank Paulson had just laid out a plan to place Fannie Mae and Freddie Mac, the two giant government-sponsored enterprises, into government conservatorship.

Of all the emergency actions the government had to take in 2008, none was more frustrating than the rescue of Fannie and Freddie. The problems at the two GSEs had been visible for years. Fannie and Freddie had expanded beyond their mission of promoting homeownership. They had behaved like a hedge fund that raised huge amounts of money and took significant risks. In my first budget, I warned that Fannie and Freddie had grown so big that they presented "a potential problem" that could "cause strong repercussions in financial markets."

In 2003, I proposed a bill that would strengthen the GSEs' regulation. But it was blocked by their well-connected friends in Washington. Many Fannie and Freddie executives were former government officials. They had close ties in Congress, especially to influential Democrats like Congressman Barney Frank of Massachusetts and Senator Chris Dodd of Connecticut. "Fannie Mae and Freddie Mac are not facing any kind of financial crisis," Barney Frank said at the time.

That claim seemed more implausible as the years passed. In my 2005 budget, I issued a more dire warning. "The GSEs are highly leveraged, holding much less capital in relation to their assets than similarly sized financial institutions," the budget read. ". . . Given the very large size of each enterprise, even a small mistake by a GSE could have consequences throughout the economy."

**Exhibit 3**

Hank Paulson, *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System* (2010) (excerpts).

# ON THE BRINK

*Inside the Race to Stop the Collapse
of the Global Financial System*

## HENRY M. PAULSON, JR.



**BUSINESS
PLUS**

NEW YORK   BOSTON

CH 3116

Copyright © 2010 by Henry M. Paulson, Jr.
Foreword Copyright © 2011 by Barney Frank
All rights reserved. Except as permitted under the U.S. Copyright Act of 1976, no part of this publication may be reproduced, distributed, or transmitted in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

Business Plus
Hachette Book Group
237 Park Avenue
New York, NY 10017

www.HachetteBookGroup.com

Business Plus is an imprint of Grand Central Publishing.
The Business Plus name and logo are trademarks of Hachette Book Group, Inc.

The publisher is not responsible for websites (or their content) that are not owned by the publisher.

Printed in the United States of America

Originally published in hardcover by Business Plus

First Trade Edition: February 2011

10 9 8 7 6 5 4 3 2 1

ISBN: 978-0-446-56194-5 (pbk.)
LCCN: 2009939043

# CHAPTER 1

*Thursday, September 4, 2008*

Do they know it's coming, Hank?" President Bush asked me.

"Mr. President," I said, "we're going to move quickly and take them by surprise. The first sound they'll hear is their heads hitting the floor."

It was Thursday morning, September 4, 2008, and we were in the Oval Office of the White House discussing the fate of Fannie Mae and Freddie Mac, the troubled housing finance giants. For the good of the country, I had proposed that we seize control of the companies, fire their bosses, and prepare to provide up to $100 billion of capital support for each. If we did not act immediately, Fannie and Freddie would, I feared, take down the financial system, and the global economy, with them.

I'm a straightforward person. I like to be direct with people. But I knew that we had to ambush Fannie and Freddie. We could give them no room to maneuver. We couldn't very well go to Daniel Mudd at Fannie Mae or Richard Syron at Freddie Mac and say:

2    HENRY M. PAULSON, JR.

"Here's our idea for how to save you. Why don't we just take you over and throw you out of your jobs, and do it in a way that protects the taxpayer to the disadvantage of your shareholders?" The news would leak, and they'd fight. They'd go to their many powerful friends on Capitol Hill or to the courts, and the resulting delays would cause panic in the markets. We'd trigger the very disaster we were trying to avoid.

I had come alone to the White House from an 8:00 a.m. meeting at Treasury with Ben Bernanke, the chairman of the Federal Reserve Board, who shared my concerns, and Jim Lockhart, head of the Federal Housing Finance Agency (FHFA), the main regulator for Fannie and Freddie. Many of our staffers had been up all night—we had all been putting in 18-hour days during the summer and through the preceding Labor Day holiday weekend—to hammer out the language and documents that would allow us to make the move. We weren't quite there yet, but it was time to get the president's official approval. We wanted to place Fannie and Freddie into conservatorship over the weekend and make sure that everything was wrapped up before the Asian markets opened Sunday night.

The mood was somber as I laid out our plans to the president and his top advisers, who included White House chief of staff Josh Bolten; deputy chief of staff Joel Kaplan; Ed Lazear, chairman of the Council of Economic Advisers; Keith Hennessey, director of the National Economic Council (NEC); and Jim Nussle, director of the Office of Management and Budget. The night before, Alaska governor Sarah Palin had electrified the Republican National Convention in St. Paul, Minnesota, with her speech accepting the nomination as the party's vice presidential candidate, but there was no mention of that in the Oval Office. St. Paul might as well have been on another planet.

The president and his advisers were well informed of the seri-

ousness of the situation. Less than two weeks before, I had gotten on a secure videoconference line in the West Wing to brief the president at his ranch in Crawford, Texas, and explained my thinking. Like him, I am a firm believer in free markets, and I certainly hadn't come to Washington planning to do anything to inject the government into the private sector. But Fannie and Freddie were congressionally chartered companies that already relied heavily on implicit government support, and in August, along with Bernanke, I'd come to the conclusion that taking them over was the best way to avert a meltdown, keep mortgage financing available, stabilize markets, and protect the taxpayer. The president had agreed.

It is hard to exaggerate how central Fannie and Freddie were to U.S. markets. Between them they owned or guaranteed more than $5 trillion in residential mortgages and mortgage-backed securities—about half of all those in the country. To finance operations, they were among the biggest issuers of debt in the world: a total of about $1.7 trillion for the pair. They were in the markets constantly, borrowing more than $20 billion a week at times.

But investors were losing faith in them—for good reason. Combined, they already had $5.5 billion in net losses for the year to date. Their common share prices had plunged—to $7.32 for Fannie the day before from $66 one year earlier. The previous month, Standard & Poor's, the rating agency, had twice downgraded the preferred stock of both companies. Investors were shying away from their auctions, raising the cost of their borrowings and making existing debt holders increasingly nervous. By the end of August, neither could raise equity capital from private investors or in the public markets.

Moreover, the financial system was increasingly shaky. Commercial and investment bank stocks were under pressure, and we were nervously monitoring the health of several ailing institutions,

4    HENRY M. PAULSON, JR.

including Wachovia Corporation, Washington Mutual, and Lehman Brothers. We had seen what happened in March when Bear Stearns's counterparties—the other banks and investment houses that lent it money or bought its securities—abruptly turned away. We had survived that, but the collapse of Fannie and Freddie would be catastrophic. Seemingly everyone in the world—little banks, big banks, foreign central banks, money market funds— owned their paper or was a counterparty. Investors would lose tens of billions; foreigners would lose confidence in the U.S. It might cause a run on the dollar.

The president, in suit coat and tie as always, was all business, engaged and focused on our tactics. He leaned forward in his blue-and-yellow-striped armchair. I sat in the armchair to his right; the others were crowded on facing sofas.

I told the president we planned to summon the top management of Fannie and Freddie to meet with Bernanke, Lockhart, and me the following afternoon. We'd lay out our decision and then present it to their boards on Saturday: we would put $100 billion of capital behind each, with hundreds of billions of dollars more available beyond that, and assure both companies of ample credit lines from the government. Obviously we preferred that they voluntarily acquiesce. But if they did not, we would seize them.

I explained that we had teams of lawyers, bank examiners, computer specialists, and others on standby, ready to roll into the companies' offices and secure their premises, trading floors, books and records, and so forth. We had already picked replacement chief executives. David Moffett, a former chief financial officer from U.S. Bancorp, one of the few nearly pristine big banks in the country, was on board for Freddie Mac. For Fannie Mae we'd selected former TIAA-CREF chief executive and chairman Herb Allison. (He was vacationing in the Caribbean, and when I reached him later and twisted his arm to come to Washington the next day,

he'd initially protested: "Hank, I'm in my flip-flops. I don't even have a suit down here." But he'd agreed to come.)

White House staff had been shocked when we first suggested conservatorship for Fannie and Freddie, which had the reputation of being the toughest street fighters in Washington. But they liked the boldness of the idea, as did the president. He had a deep disdain for entities like Fannie and Freddie, which he saw as part of a permanent Washington elite, detached from the heartland, with former government officials and lobbyists cycling through their ranks endlessly while the companies minted money, thanks, in effect, to a federal entitlement.

The president wanted to know what I thought the longer-term model for Fannie and Freddie ought to be. I was keen to avoid any existential debate on the two companies that might bog down in partisan politics on the Hill, where Fannie and Freddie had ardent friends and enemies.

"Mr. President," I replied, "I don't think we want to get into that publicly right now. No one can argue that their models aren't seriously flawed and pose a systemic risk, but the last thing we want to start right now is a holy war."

"What do you suggest?"

"I'll describe this as a time-out and defer structure until later. I'll just tell everybody that we're going to do this to stabilize them and the capital markets and to put the U.S.A. behind their credit to make sure there's mortgage finance available in this country."

"I agree," the president said. "I wouldn't propose a new model now, either. But we'll need to do it at the right time, and we have to make clear that what we are doing now is transitory, because otherwise it looks like nationalization."

I said that I had come to believe that what made most sense longer-term was some sort of dramatically scaled-down structure where the extent of government support was clear and the com-

8    HENRY M. PAULSON, JR.

still had not done enough to document the capital problems. We sent in more help. Sheila Bair, chairman of the Federal Deposit Insurance Corporation, which had ample experience in closing banks, agreed to send me her best person to help write a case.

Finally, Lockhart managed to get his examiners to sign off on what we needed. Either Jim had worn those examiners down or they had come to realize that immediate conservatorship was the best way for them to resolve this dangerous situation with their reputations intact.

Thursday evening, Jim put in calls to the CEOs of Fannie and Freddie, summoning them to a meeting Friday afternoon that Ben and I would attend at FHFA's headquarters on G Street. (Jim didn't speak directly to Mudd until Friday morning.) We arranged for the first meeting to start just before 4:00 p.m. so that the market would be closed by the time it ended. We decided to lead with Fannie Mae, figuring they were more likely to be contentious.

The companies obviously knew something was up, and it didn't take long for me to start getting blowback. Dan Mudd called me on Friday morning and got straight to the point.

"Hank," he asked, "what's going on? We've done all you asked. We've been cooperative. What's this about?"

"Dan," I said, "if I could tell you, I wouldn't be calling the meeting."

We'd been operating in secrecy and had managed to avoid any leaks for several weeks, which may be a record for Washington. To keep everyone in the dark, we resorted to a little cloak-and-dagger that afternoon. I drove to FHFA with Kevin Fromer, my assistant secretary for legislative affairs, and Jim Wilkinson, my chief of staff, and instead of hopping out at the curb, we went straight into the building's parking garage to avoid being seen. Unfortunately, Ben Bernanke walked in the front door and was spotted by a reporter for the *Wall Street Journal*, who posted word on the paper's website.

We met the rest of our teams on the fourth floor. FHFA's offices were a contrast to those at the Fed and Treasury, which are grand and spacious, with lots of marble, high ceilings, and walls lined with elegant paintings. FHFA's offices were drab and cramped, the floors clad in thin office carpet.

As planned, we arrived a few minutes early, and as soon as I saw Lockhart I pulled him aside to buck him up. He was ready but shaky. This was a big step for him.

Our first meeting was with Fannie in a conference room adjacent to Jim's office. We'd asked both CEOs to bring their lead directors. Fannie chairman Stephen Ashley and general counsel Beth Wilkinson accompanied Mudd. He also brought the company's outside counsel, H. Rodgin Cohen, chairman of Sullivan & Cromwell and a noted bank lawyer, who'd flown down hastily from New York.

Between our group from Treasury, the Fed's team, Lockhart's people, and Fannie's executives, there must have been about a dozen people in the glass-walled conference room, spread around the main table and arrayed along the walls.

Lockhart went first. He took Fannie Mae through a long, detailed presentation, citing one regulatory infraction after another. Most didn't amount to much, frankly; they were more like parking tickets in the scheme of things. He was a little nervous and hesitant, but he brought his speech around to the key point: his examiners had concluded there was a capital deficiency, the company was operating in an unsafe and unsound manner, and FHFA had decided to put it into conservatorship. He said that we all hoped they would agree to do this voluntarily; if not, we would seize control. We had already selected a new CEO and had teams ready to move in.

As he spoke I watched the Fannie Mae delegation. They were furious. Mudd was alternately scowling or sneering. Once he put his head between his hands and shook it. In truth, I felt a good bit

10   HENRY M. PAULSON, JR.

of sympathy for him. He had been dealt a tough hand. Fannie could be arrogant, even pompous, but Mudd had become CEO after a messy accounting scandal and had been reasonably cooperative as he tried to clean things up.

I followed Lockhart and laid out my argument as simply as I could. Jim, I said, had described a serious capital deficiency. I agreed with his analysis, but added that although I'd been authorized by Congress to do so, I had decided that I was not prepared to put any capital into Fannie in its current form. I told them that I felt Fannie Mae had done a better job than Freddie Mac; they had raised $7.4 billion earlier in the year, while Freddie had delayed and had a bigger capital hole. Now, however, neither could raise any private money. The markets simply did not differentiate between Fannie and Freddie. We would not, either. I recommended conservatorship and said that Mudd would have to go. Only under those conditions would we be prepared to put in capital.

"If you acquiesce," I concluded, "I will make clear to all I am not blaming management. You didn't create the business model you have, and it's flawed. You didn't create the regulatory model, and it is equally flawed."

I left unspoken what I would say publicly if they didn't acquiesce.

Ben Bernanke followed and made a very strong speech. He said he was very supportive of the proposed actions. Because of the capital deficiency, the safety and soundness of Fannie Mae was at risk, and that in turn imperiled the stability of the financial system. It was in the best interests of the country to do this, he concluded.

Though stunned and angry, the Fannie team was quick to raise issues. Mudd clearly thought Fannie was being treated with great injustice. He and his team were eager to put space between their company and Freddie, and the truth was they had done a better job. But I said that for investors it was a distinction without a difference—investors in both companies were looking to their con-

gressional charters and implicit guarantees from the United States of America. The market perceived them as indistinguishable. And that was it. The Fannie executives asked how much equity capital we planned to put in. How would we structure it? We wouldn't say. We weren't eager to give many details at all, because we didn't want to read about it in the press.

"Our board will want to take a close look at this," Mudd said, attempting to push back.

Richard Alexander, the managing partner for Arnold & Porter, FHFA's outside counsel, replied: "I need you to understand that when these gentlemen"—he meant Lockhart, Bernanke, and me—"come to your board meeting tomorrow, it's not to have a dialogue."

"Okay," Rodge Cohen said, and it was clear he understood the game was over.

After the meeting, I made a few quick calls to key legislators. I had learned much, none of it good, since going to Congress in July for unprecedented emergency authorities to stabilize Fannie and Freddie. I had said then that if legislators gave me a big enough weapon—a "bazooka" was what I specifically requested—it was likely I wouldn't have to use it. But I had not known of the extent of the companies' problems then. After I had learned of the capital hole, I had been unable to speak about it publicly, so conservatorship would come as a shock, as would the level of taxpayer support. I was also very concerned that Congress might be angered that I had turned temporary authority to invest in Fannie and Freddie, which would expire at year-end 2009, into what effectively was a permanent guarantee on all their debt.

First up were Barney Frank, chairman of the House Committee on Financial Services, and Chris Dodd, his counterpart on the Senate Banking Committee. Barney was scary-smart, ready with a quip, and usually a pleasure to work with. He was energetic, a skilled and