**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **CAROLINE HERRON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 10-943 (RMC)** |
| | ) | |
| **FANNIE MAE,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**SEALED OPINION**

This case arises from the termination of Caroline Herron in January 2010.  Ms. Herron was a contractor assigned to work at Fannie Mae (formally known as the Federal National Mortgage Association), but who really wanted to work at the Department of Treasury (Treasury).  As a former Fannie Mae Vice President, Ms. Herron used her position and knowledge of Fannie Mae operations to criticize Fannie Mae's actions in response to the 2008 financial crisis.  At the same time, she was pressing Fannie Mae to re-locate (or embed) her inside Treasury as a Fannie Mae contractor.  Ms. Herron was terminated prior to achieving her goal of moving to Treasury.  In response, Ms. Herron filed the instant Complaint against Defendants Fannie Mae and three Fannie Mae managers, Senior Vice President Eric Schuppenhauer, Chief Compliance Officer Nancy Jardini, and Director of Government Programs and New Initiatives Alanna Scott Brown.[1]

---

[1] Alanna Scott Brown's name is now Alanna Brown McCargo.  The Court will refer to her as "Ms. Brown" as in the record.

Ms. Herron alleges three counts against Defendants: (1) tortious interference with prospective economic advantage; (2) wrongful discharge; and (3) civil conspiracy to terminate Ms. Herron and impede future employment elsewhere at Fannie Mae or Treasury.  Compl. [Dkt. 1].  Defendants move for summary judgment as to all counts.  Defs. Mot. for Summ. J. [Dkt. 145] (Defs. MSJ).  Ms. Herron filed a timely opposition to the motion, to which Defendants replied.  Ms. Herron also moved for partial summary judgment on Defendants' tenth affirmative defense — which asserts that Defendants were legally privileged or justified in refusing Ms. Herron's move to Treasury due to potential conflicts of interest.  Pl. Mot. for Partial Summ. J. [Dkt. 147] (Pl. MSJ).  After full briefing on both motions, Defendants filed a notice of supplemental authority with leave of the Court.  Notice of Supplemental Authority [Dkt. 159]. Ms. Herron responded to the notice of supplemental authority, to which Defendants, in turn, replied.  For the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment and will deny Ms. Herron's Motion for Partial Summary Judgment as moot.

## I.  FACTS[2]

### A.  The 2008 Economic Crisis and Ms. Herron's Working History at Fannie Mae

Ms. Herron was employed at Fannie Mae from 2000 to 2007, where she became a vice president in charge of Sarbanes-Oxley strategy and execution.[3]  After leading several

---

[2] The record in this case is extensive.  Many of the facts that are allegedly disputed are not necessarily relevant at this stage.  Moreover, many of Ms. Herron's "disputes" fail to raise a *genuine* dispute of fact.  *See* Fed. R. Civ. P. 56.  Ms. Herron purports to deny many of Defendants' proffered facts by injecting extraneous facts and mischaracterizing the evidence to avoid summary judgment.  The Court has carefully reviewed both parties' submissions of material facts and compared them to the cited materials.

[3] The Sarbanes-Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745, is a federal statute enacted to promote transparency in corporate reporting and prevent shareholders from being misled by corporations about their financial status.

projects, including Fannie Mae's reorganization, Ms. Herron resigned in November 2007 and left Fannie Mae on good terms.

During the summer of 2007 and over the course of 2008, major financial institutions, such as Countrywide Financial, Bear Stearns, and IndyMac, collapsed. Meanwhile, Fannie Mae, one of the two largest purchasers and guarantors of mortgage loans in the country, began to experience serious financial difficulties and came under severe stress. By September 2008, it was clear that the nation was experiencing its worst financial crisis since the Great Depression.

The federal government attempted to contain the damage through a series of emergency actions. For example, the government bailed out key financial institutions and used taxpayer funds to stimulate lending and economic activity and restore consumer confidence in financial institutions. On September 6, 2008, the Federal Housing Finance Agency placed Fannie Mae into a conservatorship. The goal was to support it financially so that it could continue to operate and provide liquidity in the mortgage market. During the conservatorship, Fannie Mae retained control of much of its day-to-day operations, but the Federal Housing Finance Agency had the ultimate authority over the company's management and board of directors.

On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 (Stabilization Act), 12 U.S.C. §§ 5201 *et seq*., which, in turn, created the Troubled Asset Relief Program (TARP), 12 U.S.C. § 5211. The Executive Branch used TARP to recapitalize the banking system and major financial institutions, invest and stabilize the automotive industry and the American International Group, and assist struggling homeowners, among other things.

3

Pursuant to the Stabilization Act and TARP, Treasury created the Making Homes Affordable (MHA) program to provide for mortgage modification and prevent foreclosures. Treasury and Fannie Mae entered into a Financial Agency Agreement under which Fannie Mae served as a fiduciary to Treasury and administered the Home Affordable Modification Program (HAMP), which was the largest program within the broader MHA initiative.  By designing and implementing HAMP, Fannie Mae was tasked with advancing the government's main effort to prevent home foreclosures.  HAMP was a federal government-sponsored, voluntary program under which financial institutions servicing mortgage loans (servicers) could offer distressed borrowers the opportunity to modify the terms of their loans to avoid home foreclosure.[4] Borrowers could enter into a mortgage modification under HAMP once their loan servicers became enrolled in the MHA program.

In June 2009, Mr. Schuppenhauer, a Senior Vice President at Fannie Mae responsible for administering the MHA program, recruited Ms. Herron, whom he had known from her prior stint at Fannie Mae, to return.  However, Ms. Herron did not return as a Fannie Mae employee.  Instead, she returned as a W-2 contractor through a third-party contracting company, ICon Professional Services (ICon).  Fannie Mae retained Ms. Herron through ICon to provide "temporary services on a Fannie Mae project," specifically on the MHA program.  Defs. MSJ R. [Dkt. 146], Ex. Herron Dep. [Dkt. 146-1] (Herron Dep. 1) at 369;[5] *see also id.*, Ex.

---

[4] Servicers are those banks or financial institutions that collect mortgage payments and enforce foreclosures in those cases where homeowners fail to pay.

[5] The parties have filed their respective excerpts of Ms. Herron's deposition.  For purposes of this Opinion, "Herron Dep. 1" refers to the excerpt filed by Defendants in support of their motion for summary judgment and "Herron Dep. 2" refers to the excerpt filed by Ms. Herron in support

Brown Dep. [Dkt. 146-9] (Brown Dep. 1) at 62.  Although Ms. Herron's contract was "for an

hourly fee with open timeframe," she admits that she was hired for a "short-term engagement."

Pl. Opp'n [Dkt. 151], Ex. Brown Dep. [Dkt. 151-6] (Brown Dep. 2) at 60; Herron Dep. 1 at 369.

As a contractor, Ms. Herron became actively involved with Fannie Mae's administration of the

MHA program.  Specifically, she worked directly with Fannie Mae officials, loan servicers, the

Federal Housing Finance Agency, and managers at Treasury who oversaw and monitored Fannie

Mae's activities as Treasury's financial agent — particularly, Phyllis Caldwell, Chief of the

Homeownership Preservation Office, and Cindy Gertz, the Director of Operations at Treasury's

Homeownership Preservation Office.

### B.  Ms. Herron's Criticisms of Fannie Mae

Almost immediately after she was hired by ICon in June 2009 and until her

termination in January 2010, Ms. Herron "raised criticisms about how Fannie Mae was

(1) implementing its role to assist [Treasury] in modifications of home mortgage loans,

(2) engaging in a gross waste of public funds, and (3) violating its contract with Treasury."

Compl. ¶ 1.  Ms. Herron contends that she "reported her concerns about these problems, both to

senior Fannie Mae officials, and to her counterparts at Treasury who were responsible for

overseeing Fannie Mae's participation in the programs."  *Id.* ¶ 12.

Ms. Herron's criticisms of Fannie Mae's activities as Treasury's financial agent

can be divided into three: (1) Fannie Mae imposed unnecessary burdens on mortgage servicers

by requiring excessive MHA-related documentation; (2) Fannie Mae's use of a homeowner's

---

of her opposition.  The same is true of many other depositions, cited as "(Name) Dep. 1" for
Defendants' exhibits and "(Name) Dep. 2" for Ms. Herron's exhibits.

stated income, as opposed to verified income, for trial mortgage modifications was wasteful;[6] and (3) Fannie Mae failed immediately to announce Treasury's extension of the deadline for servicers to enroll in the TARP/MHA program. *See* Pl. Opp'n at 4-11. Specifically, Ms. Herron claims that Defendants "were running the MHA program in a way to maximize both incentive payments to Fannie Mae, and bonuses and other compensation to Fannie Mae's executives." *Id.* at 4. Ms. Herron asserts that Fannie Mae used servicer enrollments and trial modifications as metrics for incentive payments and bonuses. Therefore, Ms. Herron alleges she was a whistleblower whose criticisms constituted protected disclosures about Defendants' gross mismanagement and gross waste of taxpayer funds for their personal gain.

### Excessive Burdens on Servicers

Ms. Herron argues that she complained "within Fannie Mae that Fannie Mae was needlessly requiring excessive documentation from the servicers, and otherwise imposing unnecessary burdens on the servicers, which seriously impaired Fannie Mae's relationship with the servicers." *Id.* At her deposition, Ms. Herron testified that she told Fannie Mae officials that Fannie Mae was asking an "unreasonable level of information" from mortgage servicers seeking to be enrolled in the MHA program. Herron Dep. 1 at 450. She described the enrollment process as "overly burdensome" and that Fannie Mae employees who lacked experience with servicers were demanding additional information that prevented Fannie Mae from reaching the enrollment "goal that they were supposedly pushing for." *Id.* at 452. In other

---

[6] A trial modification period was a three-month period that allowed homeowners to make reduced payments to servicers enrolled in HAMP. During this period, homeowners could determine whether the modification to their mortgage payments was sustainable. Only after homeowners made the new, reduced monthly mortgage payments in a timely manner during the trial modification period, could the mortgage be permanently modified under HAMP.

words, "this burden on the servicers had the potential effect of reducing the number of homeowners who could benefit from this taxpayer funded program, thereby harming the MHA program and preventing it from achieving its statutory goals."  Pl. Opp'n at 5.

### Use of Stated Trial Modifications

On November 12, 2009, Ms. Herron wrote an e-mail to various Fannie Mae managers — including Defendants Schuppenhauer and Brown — identifying various problems with trial modifications in the MHA program.  Specifically, Ms. Herron had contacted "some of the top servicers for feedback on where they think they will be with [trial to permanent] conversions and why borrowers will eventually be falling out."  *Id.*, Ex. Herron Dep. [Dkt. 151-15] (Herron Dep. 2), Ex. 164 (Trial Modification E-mail).  She reported that servicers were expecting borrowers' fallout "to be in the 35% - 45% range (i.e., 55% - 65% conversion rate)."  *Id.*  However, servicers also reported that since this was their first time dealing "with a program like this, . . . their estimates [could have been] off on either end."  *Id.*

Ms. Herron suggested that many mortgage servicers may have used borrowers' stated income instead of their verified income because of "the pressure" to maximize the number of trial modifications.  *Id.*  Her concern was that borrowers who were no longer eligible for the program or who were no longer interested in staying in their homes would "take the interim payment reductions at no hassle" and then walk away without providing any income-related documentation.  *Id.*  Ms. Herron proposed moving "HAMP . . . to verified trials only" to "ensure [that] only eligible borrowers start down a HAMP path, increase the conversion rates, and reduce servicer operational overhead."  *Id.*  She also suggested "allow[ing] servicers to screen for borrower desire to stay in home so that they can take borrowers who would rather walk away down an alternative path."  *Id.*

7

Undoubtedly, Fannie Mae urged servicers to meet their trial modification goals.
*See* Brown Dep. 2 at 173, 184.  Given the conversion rates identified in the e-mail, Ms. Herron
claims that Fannie Mae's insistence on using borrowers' stated trial modifications was evidence
of gross waste.  Ms. Herron also claims that her e-mail was a protected disclosure of Fannie
Mae's mismanagement.

### Servicer Enrollment Deadline

On December 9, 2009, Secretary of Treasury Timothy Geithner announced that
Treasury was going to extend the TARP/MHA program's enrollment deadline from December
31, 2009 to October 3, 2010.  Ms. Herron contacted Fannie Mae officials on many occasions to
remind them to notify servicers of this change in the program.  On the day after Secretary
Geithner's announcement, i.e., December 10, 2009, Ms. Herron sent an e-mail to Marcel Bryar,
Fannie Mae's Vice President for the Project Management Office, to ask whether Treasury had
confirmed the deadline extension announced by Secretary Geithner.  *See* Pl. Opp'n, Ex. Bryar
Dep. [Dkt. 151-7] (Bryar Dep. 2), Ex. 21 (Herron to Bryar December 10 E-mail).

On December 11, 2009, at 8:41 a.m., Ms. Herron emailed Ms. Gertz and another
Treasury employee asking whether the deadline extension applied to the MHA program.  *See id.*,
Ex. Gertz Dep. [Dkt. 151-13] (Gertz Dep. 2), Ex. 12 (Herron to Gertz December 11 E-mail).
That e-mail, which was copied to various Fannie Mae managers, including Ms. Brown, also
stated that Fannie Mae "probably should get out . . . [a] communication to that effect by Monday
[, December 14]" because Ms. Herron kept receiving "calls from servicers checking in last
minute about enrolling . . . ."  *Id.*  Ms. Brown replied at 8:44 a.m. that the extension applied to
MHA and that "there [was] still a push on some programs to get signup[s] ASAP" by the end of
the year.  *Id.*  At 8:45 a.m., Ms. Herron immediately responded and asked once again whether

8

Fannie Mae was going to send "out guidance or communication to the servicers/public about the extension?," to which Ms. Brown responded at 8:54 a.m., "Nothing planned that I am aware of. If anything, we may do it later in the month." *Id.* At 8:57 a.m., Ms. Herron told Ms. Brown that Fannie Mae should not be "making any assumptions" about the extension and that, instead, it should get confirmation from Treasury "in writing" and "make sure it is communicated broadly within the program and to the public." *Id.*

At 9:06 a.m., Ms. Brown sent an e-mail to Mr. Schuppenhauer, Mr. Bryar, and other Fannie Mae managers to advise that Ms. Herron was asking about communicating "the program signup extension." Brown Dep. 2, Ex. 24 (Brown to Schuppenhauer December 11 E-mail). Ms. Brown also wrote that her team was working with the December 31 deadline in mind and asked whether the extension "has been discussed with Treas[ury] leadership so we can start thinking about the right internal and servicer communication plan." *Id.* Mr. Schuppenhauer replied that it was "[n]ot discussed yet" and that Ms. Brown should "[s]tay the course to get as many [servicers] in as possible ahead of January [2010]" because "[i]t would be positive to have new entrants and the motivation is there." *Id.*

On December 13, 2009, Mr. Bryar responded to Ms. Herron's December 10 query as to whether Treasury had confirmed the enrollment deadline's extension by stating, "We did, we're good." *See* Herron to Bryar December 10 E-mail. Mr. Bryar also asked Ms. Herron whether she was thinking of "a particular audience" and "[p]articular workstreams" to communicate the extension. *Id.* There is no evidence in the record that Ms. Herron responded to this e-mail. One day later, on December 14 at 1:05 p.m., Ms. Brown emailed Ms. Herron asking whether Treasury had confirmed "in writing" the program's extension, to which Ms.

Herron responded that she "could be on the call tomorrow and provide an update."  Defs. MSJ

R., Ex. 45 [Dkt. 146-62] (Brown to Herron December 14 E-mail).

Almost immediately, at 1:12 p.m., Ms. Herron sent an e-mail to Ms. Caldwell at

Treasury to ask whether the TARP extension applied to the MHA's enrollment deadline for

servicers and, if so, whether servicers should be notified of the extension.  *Id.*, Ex. 46 [Dkt. 146-

63] (Herron to Caldwell December 14 E-mail).   At 1:47 p.m., Fannie Mae manager Jametta

Jenkins told Ms. Brown and Ms. Herron that HAMP's leadership had met earlier that day and

that Mr. Schuppenhauer decided he was "going to follow-up with Phyllis Caldwell about [the

modification program] outreach."  Brown Dep. 2, Ex. 29 (Jenkins E-mail).  Ms. Jenkins also

told Ms. Herron to "hold off" on communicating the extension "[u]ntil [they] got something in

writing from [Treasury] or guidance from [Mr. Schuppenhauer]."  *Id.*  That same day, at 8:43

p.m., Ms. Caldwell responded to Ms. Herron's earlier e-mail and told her that they were

"confirming with counsel" how to publicize the extension and that there was "no reason [she]

could think of not to let [the servicers] know" that the deadline was extended.  Herron to

Caldwell December 14 E-mail.

At the end of the next day, December 15, 2009 at 6:59 p.m., Ms. Gertz at

Treasury wrote to Ms. Herron, "It's official . . . we can sign up new . . . servicers until

10/3/10!!!"  Pl. Opp'n, Ex. Schuppenhauer Dep. [Dkt. 151-22] (Schuppenhauer Dep. 2), Ex. 42

(Gertz to Herron December 15-16 E-mail).  Ms. Herron immediately forwarded the e-mail to

various Fannie Mae managers, including Defendants Mr. Schuppenhauer and Ms. Brown,

stating that "the servicer enrollment extension is official . . . I'll assume [Ms. Brown] or [Ms.

Jenkins] is already working with communications on getting an official announcement out to

the servicers."  *Id.*  Mr. Bryar, in turn, added the communications team to the e-mail thread and

10

told them to "punch[] up a quick servicer communication on this." *Id.* However, on December 16 at 11:33 a.m., Mr. Schuppenhauer indicated that he did not "want a communication on this" and, instead, ordered everyone to "just roll with it below the radar." *Id.*

At noon, on December 16, Ms. Herron disagreed with Mr. Schuppenhauer. She sent an e-mail insisting that a notice of the extension was necessary and asking, "[I]s it [Fannie Mae's] decision or Treasury's as to whether Treasury policy gets communicated? Have you cleared holding back on not communicating with [Ms. Caldwell]?" *Id.* At 12:45 p.m., an angry Mr. Schuppenhauer responded solely to Mr. Bryar, "I have counted to 300 on this one," to which Mr. Bryar replied at 1:59 p.m., "No worries. I had the same reaction you did to the basic idea and was working off line to turn this into an administrative announcement . . . Sometimes with [Ms. Herron] the best route is the gradual, indirect one." *Id.*

Shortly thereafter, at 2:10 p.m., Mr. Bryar told Ms. Herron that Mr. Schuppenhauer did not want a "broadcast message on this," but rather, a "low key, administrative heads up, targeted at those folks with a need to know." Bryar Dep. 2, Ex. 26 (Bryar to Herron December 16 E-mail). He also told Ms. Herron to provide a "list of those situations for which we need to provide clarity." *Id.* In response, Ms. Herron once again complained about Fannie Mae's alleged stalling in announcing the deadline extension. She responded, "I think it is cleaner to just post a simple enrollment extension update . . . on [the website] with an email to that distribution list." *Id.* Ms. Herron added, "From a credibility and relationship standpoint with a new servicer who is ready to take the plunge to enroll, I think they would appreciate knowing that they don't have to work their staffs through a holiday for an exercise where the date was going to be extended anyway and which was known all along . . . ." *Id.*

11

Not having heard back from HAMP leadership that day, Ms. Herron once again emailed Fannie Mae managers on December 17 at 12:01 p.m.  Although Mr. Schuppenhauer and Mr. Bryar were unequivocal that they did not want a broadcast message at that time, Ms. Herron insisted by asking whether they had an estimated time "for when the message is going out and what it will say?"  *Id.*  Neither man responded.  Instead, Ms. Brown forwarded the e-mail to Ms. Jenkins and told her to talk to other managers about the "strategy and timing" for a communication.  *Id.*  Ms. Brown added that "this [was] not on the top list of priorities" and that they could "continue on outreach and let folks know and perhaps send a broader message out sometime in Jan[uary]."  *Id.*  Ms. Brown concluded the e-mail by stating, "Need your voice to weigh in here . . . and need [Ms. Herron] to stop with the messages on this."  *Id.*

Ms. Herron did not stop.  At 3:14 p.m., Ms. Herron sent a long e-mail to Ms. Gertz at Treasury to give her "a heads up that Fannie Mae has not yet sent out an official communication on the enrollment extension and does not have any firm plans to do so before the year end."  Gertz Dep. 2, Ex. 26 (Herron to Gertz December 17 E-mail).  Ms. Herron also wrote, "Fannie Mae is not communicating the enrollment extension because they think they have pressure on potential new servicers with the 12/31 date looming to get them to sign up for HAMP rather than wait until next year."  *Id.*  Ms. Herron reiterated her concern about servicers' staffs working through the holiday because "it doesn't end up being just Fannie Mae credibility that gets impacted but also Treasury's in instances like this."  *Id.*  Ms. Herron concluded by telling Ms. Gertz to call her if she wanted to talk about the extension and adding, "[i]f you think it is important too, please reach out to [Mr. Bryar] or [Mr. Schuppenhauer] and let them know that you would like the communication to go out."  *Id.*  In response to Ms. Herron's long-email, Ms. Gertz wrote, "Thanks, I'll bring it up."  *Id.*  Ms. Gertz did not call Ms. Herron or set up a

time to discuss this topic with her.  Instead, she invited Ms. Herron to lunch to discuss Ms.

Herron's possible transition to Treasury.  *See id.*

    Later that day, at 6:54 p.m., Bryan Kanefield, a Fannie Mae manager involved in

the administration of the MHA program, told a colleague in the communications team that Mr.

Bryar was "totally against [Ms. Herron]'s push."  *Id.*, Ex. 25 (Kanefield December 17 E-mail).

Mr. Kanefield also reached out to Ms. Jenkins "to have her identify any servicer that was

looking to work through the holiday weekend to meet the previous 12/31 deadline and alert

them below the radar."  *Id.*  Mr. Bryar agreed with this approach because "[i]t addresse[d] [Ms.

Herron]'s point and [was] in sync with [Mr. Schuppenhauer]'s 'don't do a broadcast message.'"

*Id.*  At 11:33 p.m., Mr. Bryar told Ms. Herron and the HAMP leadership that Mr. Kanefield

was "working with [Ms. Jenkins] to communicate this 'off-line,' so to speak."  Bryar Dep. 2,

Ex. 30 (Bryar to Herron December 17 E-mail).  Mr. Bryar concluded by stating, "I think we're

all set."  *Id.*

    Ms. Herron was not satisfied.  On Friday, December 18, 2009, at 6:45 a.m., Ms.

Herron replied, "What does 'offline' mean exactly and what is the timing? I'm at Treasury this

morning and they will want to know."  *Id.*  At 2:13 p.m., Ms. Gertz wrote to Ms. Caldwell and

Mr. Schuppenhauer, "While I understand that we are trying to get as many servicers as possible

to sign up before year end, I don't think there's a reason to force them (or us) to that deadline.

Not sure how it will look if they jump through hoops to get there before 12/31 and then we

announce the extension. I think we should be posting this on [the website]."  Gertz Dep. 2, Ex.

27 (Gertz to Schuppenhauer December 18 E-mail).  Ms. Gertz also asked them about their

thoughts on this.  *See id.*  Mr. Schuppenhauer promptly replied at 2:17 p.m. — copying Ms.

Herron and various Fannie Mae employees to the e-mail — that they were working on the

announcement, but that he thought that the communication should be kept "fairly low key."  *Id.*
In terms of Fannie Mae's relationship with servicers, he wrote, "We have already taken pressure
off based on turning down the volume through servicer discussions."  *Id.*

There is no evidence in the record that Ms. Caldwell or Ms. Gertz responded to
Mr. Schuppenhauer's e-mail.  On Monday, December 21, 2009, Fannie Mae was closed due to
a snowstorm.  When the offices reopened on Tuesday, December 22, Fannie Mae posted an
announcement concerning the deadline's extension on the registration page of the HAMP
website.  *See* Defs. MSJ R., Ex. 50 [Dkt. 146-67] (Extension Announcement E-mail).[7]

### C.  Ms. Herron's Move to Treasury and her Termination

While Ms. Herron was raising these criticisms within Fannie Mae and to
Treasury, Ms. Herron was trying to move to Treasury as an embedded Fannie Mae contractor.
Given her status as a Fannie Mae contractor, Ms. Herron was unable to join Treasury
immediately as an employee without a waiver.  Ms. Gertz suggested that Ms. Herron embed at
Treasury as a Fannie Mae contractor so that she would be better positioned to start the waiver
process and be hired by Treasury as a regular employee.  *See* Herron Dep. 2 at 834-835; Defs.
MSJ R., Ex. 15 [Dkt. 146-32] (Proposal of Embedded Contractor).  The arrangement that Ms.
Herron requested was unprecedented because Fannie Mae had never embedded any of its
contractors at Treasury.

---

[7] Ms. Herron claims that since the announcement was posted on the website's registration page,
as opposed to the main page, "it was almost certain that all servicers would not see it."  Pl.
Opp'n, Pl. Response to Defs. SOF No. 104 [Dkt. 151-4] (Response to SOF) at 107.  Ms. Herron
does not cite anything to support this statement.  Since servicers would presumably go to the
registration page to enroll in HAMP, it cannot be seriously argued that posting the announcement
on this page was clearly improper.  In any event, the Court will reject this unsupported assertion.

On December 15, 2009, Ms. Herron communicated Ms. Gertz's proposal to Mr. Schuppenhauer and asked whether he was amenable to the idea.  *See* Proposal of Embedded Contractor.  Mr. Schuppenhauer immediately replied, "I like this idea. Get a plan — I will need to make sure others are ok." *Id.*  Ms. Herron forwarded the e-mail to Ms. Gertz and told her to call Mr. Schuppenhauer to discuss the move's "scope and timing." *Id.* Ms. Herron also stated that Mr. Schuppenhauer "will probably need to clear it with Mike Williams, et al," thus recognizing that there were still steps to be taken before the move was approved.  In fact, Mr. Schuppenhauer could not authorize Ms. Herron's move to Treasury as an embedded contractor without the approval from Terry Edwards, Executive Vice President of Fannie Mae, and Mr. Williams, Fannie Mae's Chief Executive Officer.  *See* Herron Dep. 1 at 145-46; *see also* Defs. MSJ R., Ex. Williams Dep. [Dkt. 146-17] (Williams Dep. 1) at 30; Ex. Edwards Dep. [Dkt. 146-7] (Edwards Dep.) at 17-18.

On December 18, 2009, Ms. Herron and Mr. Schuppenhauer discussed Ms. Herron's proposed move to Treasury and Ms. Herron's criticism of Fannie Mae's failure to announce the servicer deadline extension immediately.  During the meeting, Mr. Schuppenhauer asked Ms. Herron whether Ms. Gertz had received approval from the Human Resources and Legal departments at Treasury.  He also asked Ms. Herron whether she was going to be "mean" to Fannie Mae once she was relocated to Treasury.  Schuppenhauer Dep. 2, Ex. 26 (Bromwich Report) at 23.[8]  Mr. Schuppenhauer claims he made this statement "half in jest." *Id.*; *see also*

---

[8] The "Bromwich Report" was an investigative report conducted by the law firm Fried Frank at the request of Fannie Mae's Office of Investigations.  The report, which was issued on June 17, 2010, contains an investigation of Ms. Herron's factual allegations that Fannie Mae failed to comply with its duties under the Financial Agency Agreement with Treasury.  The report states that "Ms. Herron *first notified* the Company of her allegations in a letter, dated March 3, 2010 (the 'Demand Letter') from her counsel to Fannie Mae's President and Chief Executive Officer."

Defs. MSJ R., Ex. Schuppenhauer Dep. [Dkt. 146-15] (Schuppenhauer Dep. 1) at 277. The statement was also made "at the same time he acknowledged having developing concerns that Ms. Herron had criticized Fannie Mae to Treasury, and he admitted . . . that these concerns about Ms. Herron's criticism of Fannie Mae may have affected his views about Ms. Herron's proposed transition to Treasury." Bromwich Report at 23.

Shortly after the meeting, Ms. Herron wrote to Ms. Gertz at Mr. Schuppenhauer's insistence, "We just wanted to confirm that the details have been worked through with your legal/HR folks and find out if there is anything specific Fannie Mae needs to do from a contracting, billing, etc. standpoint to facilitate." Defs. MSJ R., Ex. 16 [Dkt. 146-33] (Herron to Gertz December 18 Follow-up E-mail). Later that day, Mr. Schuppenhauer spoke with co-defendant Nancy Jardini, who was Fannie Mae's acting Chief Compliance Officer, about Ms. Herron's proposed move. Ms. Jardini indicated that the move was a "bad idea" and that there were compliance issues — specifically, potential organizational conflict of interest (OCI) and ethics issues — that needed to be resolved before Ms. Herron could move to Treasury as an embedded contractor. *See id.*, Ex. Jardini Dep. [Dkt. 146-10] (Jardini Dep.) at 43, 47.[9] Mr.

---

Bromwich Report at 1 (emphasis added). Ms. Herron also notified the Special Inspector General of the TARP (SIGTARP) of the allegations in her Demand Letter. *See id.* Both the Demand Letter and her written communications to SIGTARP occurred after Ms. Herron's contract with ICon was terminated. The report makes clear that Fried Frank's "investigation did not analyze or assess the legal merits of Ms. Herron's putative claims against" Fannie Mae, but rather, determined "whether there was evidence that Fannie Mae personnel violated the Company's Code of Conduct and corporate policies." *Id.* at 2 n.3. The Report concluded that there was no violation. *Id.* at 34.

[9] Ms. Herron attempts to deny this fact, but fails to cite any evidence that could contradict or undermine Ms. Jardini's testimony. Instead, Ms. Herron expands at length on Mr. Schuppenhauer's alleged motivations and omits any reference to Mr. Schuppenhauer's conversation with Ms. Jardini on December 18, 2009. *See* Response to SOF No. 33 at 32-34. Ms. Herron has failed to raise a genuine dispute of fact. This example is just one of many in

16

Schuppenhauer testified that Ms. Jardini "put the fear of God in me about this type of arrangement."  Schuppenhauer Dep. 1 at 469.

On December 18, at 5:30 p.m., Ms. Brown and Ms. Herron discussed the proposed move.  *See* Brown Dep. 2 at 413-14, 422.  At 6:30 p.m., Ms. Brown emailed Mr. Schuppenhauer about her conversation with Ms. Herron and copied Mr. Edwards.  Ms. Brown stated, "[Ms. Herron] mentioned that treas[ury] wants to take on a more active and high touch role with servicers, which kind of worried me. [A]nyhow, we have a transition plan in the works (we were anticipating offboarding [Ms. Herron] in March anyway), and [Ms. Jenkins]'s staff . . . will be picking up quickly starting on the 4th. We'll roll [Ms. Herron] fully off by end of Jan[uary]."  *Id.*, Ex. 35. (Brown to Schuppenhauer December 18 E-mail).  Mr. Schuppenhauer replied that evening, "I checked with compliance.  We may have issues here. Let's discuss on Monday."  *Id.*  Minutes later, Mr. Schuppenhauer again wrote Ms. Brown and Mr. Edwards, "The last part of your message [is] inconsistent with what [Ms. Caldwell] and I have discussed.  I think there is a little agenda going on here."  *Id.*, Ex. 36 (Schuppenhauer to Brown December 18 E-mail).

Mr. Schuppenhauer and Ms. Brown continued to exchange e-mails in the evening about Ms. Herron's potential move.  At 7:07 p.m., Mr. Schuppenhauer told Ms. Brown that they should talk on Monday, December 21, and that he was "[v]ery concerned about the [Ms. Herron] thing."  *Id.*, Ex. 37 (Schuppenhauer's December 18 Follow-up E-mail).  Ms. Brown responded, "Why, what did she say to you?  I had a few concerns in some of what she said to me."  *Id.*  At

which Ms. Herron claims to deny a proffered fact, but instead injects extraneous and unrelated facts.

11:26 p.m., Mr. Schuppenhauer answered, "I think she trashed us based on some of the things she said to me. I hope I am wrong." *Id.*

   Ms. Herron left Fannie Mae for a mandatory work pause between December 19, 2009 and January 3, 2010.  On December 20, 2009, Ms. Gertz wrote to Ms. Herron, Mr. Schuppenhauer, and Mr. Bryar, "I told HR [Human Resources at Treasury] that Fannie was going to 'embed' a contractor at Treasury.  They didn't have an issue. I am assuming you will simply remain a Fannie contractor . . . . I believe third party contractors are a direct pass through to Treasury — [Mr. Bryar] is that right?"  Gertz Dep. 2, Ex. 30 (Gertz to Herron December 20 E-mail).  On December 21 at 10:00 a.m., Mr. Schuppenhauer wrote back to Ms. Gertz, "Our compliance folks want to touch base with your compliance folks and make sure we are all covered off.  I understand there are some wonderfully obscure rules that we need to make sure we are mindful of."  *Id.*  Mr. Schuppenhauer also introduced Ms. Jardini as the point of contact for Fannie Mae.  *Id.*

   In a separate e-mail, Mr. Schuppenhauer told Ms. Jardini, "I want to make sure we stay completely within bounds . . . I do not want us to proceed or I want us to have very detailed set of things that [Ms. Herron] must follow if she does embed."  *Id.*  At 10:07 a.m., Ms. Jardini responded, "Got it. Dawn [Patterson, the head of the Treasury-OFS Compliance Office] is pretty much out of pocket all week.  We will need her written agreement as well as John Hill's or Gary Grippo's.  I will chat with [Ms. Gertz]."  *Id.*  At 4:09 p.m., Ms. Gertz asked Ms. Jardini for a mitigation plan for Ms. Herron.  Defs. Opp'n [Dkt. 150], Ex. J [Dkt. 150-12] (Gertz to Jardini December 22 E-mail).  Ms. Jardini promptly responded, "That's what I wanted to discuss with you.  I need some guidance from you and [Mr. Patterson] on how a mitigation plan would be structured given the unique nature of the proposed arrangement.  Our experience with

mitigation plans has been more organizational — setting up and controlling firewalls.  I need

your collective guidance on how a mitigation plan would work in this context."  *Id.*  At 4:45

p.m., Ms. Jardini told Mr. Schuppenhauer that she was working on the issues surrounding Ms.

Herron's proposed move, to which Mr. Schuppenhauer replied, "To be clear — I don't want it to

go forward."   Schuppenhauer Dep. 2, Ex. 48 (Jardini to Schuppenhauer December 22 E-mail).

> At 5:59 p.m., Ms. Jardini wrote back to Ms. Gertz, "Per our earlier discussion, we

will need to have a conversation with [Mr. Patterson of the Treasury-OFS Compliance Office] to

ensure that Caroline Herron has a remediation plan [*i.e.*, a mitigation plan] that addresses all of

your concerns and our[s].  I will be out after tomorrow until January 4.  In the meantime, John

Wilhelmy can assist."  Pl. MSJ, Gertz Dep. [Dkt. 147-9], Ex. 35 (Jardini to Gertz December 22

Follow-up E-mail).  During Ms. Jardini's absence, Fannie Mae attorneys for MHA Compliance,

Mr. Wilhelmy and Julie Silva, worked on a mitigation plan for Ms. Herron.  *See* Defs. MSJ R.,

Ex. Wilhelmy Dep. [Dkt. 146-16] (Wilhelmy Dep.) at 322, 442-443.  During this period of time,

Mr. Wilhelmy and Laurie Adams, Treasury's compliance attorney, also discussed the importance

of Treasury approving a mitigation plan that addressed any organizational conflict of interest

issues between Treasury and Fannie Mae.  *See id.*, Ex. Adams Dep. [Dkt. 146-2] (Adams Dep. 1)

at 77, 97-99.

> On December 30, 2009, Ms. Gertz and Ms. Herron met for lunch.  Ms. Gertz told

Ms. Herron that they were working on an organizational conflict of interest mitigation plan so

that she could become embedded at Treasury.  Herron Dep. 1 at 120-122.  Back at work, on

January 4, 2010, at 10:39 a.m., Ms. Herron sent an e-mail to Ms. Brown and Ms. Jenkins

advising that Ms. Herron was going to be at Treasury that afternoon and that "Treasury wants to

move fast . . . so I want to make sure we have the details [of the transition] worked out so it is as

seamless as possible."  Pl. MSJ, Ex. 9 [Dkt. 147-11] (Herron to Brown January 4 E-mail) at 3-4.

Ms. Brown immediately forwarded the communication to Mr. Schuppenhauer and Ms. Jardini

and told them that Ms. Herron was "apparently getting direction from Treasury already."  *Id.*  At

11:04 a.m., Ms. Jardini asked Ms. Herron to call her to discuss some "compliance issues" and

"obstacles" that needed to be cleared first.  Defs. MSJ R., Ex. 21 [Dkt. 146-38] (Jardini to

Herron January 4 E-mail).  After Ms. Jardini and Ms. Herron talked, Ms. Jardini sent an e-mail to

Ms. Gertz at Treasury that "[organizational conflict of interest] issues must be identified and

resolved through a formal plan before [Ms. Herron] can participate in any internal Treasury

meetings or do any other work in new capacity."  *Id.*  Ms. Gertz replied, "Agreed.  Preparation of

the plan is in your court, I believe."  *Id.*

At 12:32 p.m., Ms. Adams of Treasury contacted Ms. Jardini to tell her, "From a

[conflict of interest] point of view, we need only a mitigation plan stating that she will be treated

in the same way as a Fannie Mae employee, and will be considered a key individual.  We will

look to approve once we receive that from you."  *Id.*, Ex. 22 [Dkt. 146-39] (Adams to Jardini

January 4 E-mail).  Ms. Jardini quickly replied that she agreed that it was straightforward with

respect to the personal conflict of interest issues.  *See id.*  However, Ms. Jardini added that there

was also an organizational conflict of interest issue that required a "more detailed mitigation

plan" and that Mr. Wilhelmy was working on it with outside counsel.  *Id.*  At 1:33 p.m., Ms.

Herron contacted Ms. Jardini to ask her about the timeline for the mitigation plan because Ms.

Herron wanted to start working at Treasury that week.  *See id.*  Ms. Jardini responded that Mr.

Wilhelmy would be sending Ms. Adams shortly a "list of the legal compliance elements" to be

addressed with Treasury.  *Id.*

On January 5, 2010, Mr. Wilhelmy sent the list to Ms. Adams at Treasury.  The list contained ten questions relevant to potential personal and organizational conflict of interest issues — namely, questions about Ms. Herron's new role and functions as an embedded contractor at Treasury.  *See* Defs. MSJ R., Ex. 23 [Dkt. 146-40] (Compliance Questions for Mitigation Plan).  At 11:37 a.m., Ms. Adams forwarded the questions to both Mr. Patterson and Ms. Gertz.  *Id.*, Ex. 24 [Dkt. 146-41] (Ms. Gertz's Answers to Compliance Questions).  At 2:47 p.m., Ms. Gertz sent an email to Ms. Adams and Mr. Patterson, copying Mr. Schuppenhauer, with partial answers to four of ten questions.  *Id.*[10]  Ms. Gertz did not send her answers to Mr. Wilhelmy, Fannie Mae's compliance attorney.  *Id.*  Fannie Mae did not receive any further responses to the ten questions from anyone else at Treasury, including Ms. Adams or Mr. Patterson.  *See* Adams Dep. 1 at 34-35, 79; *see also* Herron Dep. 1 at 245-46.  Ms. Adams testified that she started preparing her responses to the questions, but stopped once she was informed that Fannie Mae was no longer interested in the proposed arrangement.  Pl. MSJ, Ex. 2 Adams Dep. [Dkt. 147-4] (Adams Dep. 2) at 79-82.

On January 8, 2010, Ms. Gertz and Jack Welch, another Treasury manager at the Office of the Director of Financial Agents, met with Ms. Herron and showed her the work space

---

[10] Ms. Herron repeatedly argued that "Ms. Gertz provided *detailed* responses that same day, which addressed *the majority* of the questions; nobody at Fannie Mae ever told Ms. Gertz that her responses to the 'ten questions' were inadequate or that more information was needed, so that she believed the mitigation plan was close to final form."  Pl. Opp'n at 20 (emphasis added); *see also* Pl. MSJ at 11 (indicating that Ms. Gertz "promptly answered *most* of the questions" and that "nobody at Fannie Mae told Ms. Gertz or anyone else that her responses were insufficient") (emphasis added).  Answers to four of ten questions clearly did not constitute a "majority" of the questions.  Ms. Herron's argument becomes more erroneous considering that one of Ms. Gertz's four answers was, "I'll defer to Legal on this one, but she remains a Fannie employee (Darius, can you help here?)"  Ms. Gertz's Answers to Compliance Questions.  This answer is neither complete nor detailed.  The Court rejects Ms. Herron's mischaracterization of the record.

that would be assigned to her at Treasury.[11]  On Monday, January 11, 2010, at 9:40 a.m., Ms. Herron wrote to Ms. Gertz and Mr. Welch, "Just checking in to see if you had a chance to connect with [Ms.] Adams to see if the conflicts/compliance issues have been worked out for my transition to Treasury.  There are still a few administrative things we'll need to work through here once we get the green light from Treasury."  Defs. MSJ R., Ex. 25 [Dkt. 146-42] (Herron to Gertz January 11 E-mail).[12]  Ms. Gertz promptly responded to Ms. Herron, copying Mr. Schuppenhauer, "I talked to [Mr. Schuppenhauer] on Friday, [January 8,] and it sounds like this is not going to work."  *Id.*  At 11:24 a.m., Ms. Herron wrote to Ms. Jardini and Messrs. Wilhelmy, Schuppenhauer, and Bryar that Ms. Gertz said that "Fannie Mae Legal could not get comfortable with the contracting arrangement being considered for my program services at Treasury because it could be construed as a gift to Treasury."  *Id.*, Ex. 27 [Dkt. 146-44] (Herron to Wilhelmy January 11 E-mail].  Ms. Herron asked for confirmation of this information.  *Id.*  At 12:18 p.m., Mr. Welch wrote to Mr. Wilhelmy that Mr. Schuppenhauer and Ms. Gertz had spoken about the proposed move and that Ms. Herron was no longer pursuing it so there was "no need to meet on this."  *Id.*, Ex. 26 [Dkt. 146-43] (Welch to Wilhelmy E-mail).

---

[11] Ms. Herron claims in her statement of facts that Ms. Gertz and Mr. Welch "explained that everything was approved by Treasury for her on-site work, and that they were awaiting final confirmation from Ms. Adams . . . ." Pl. MSJ, Pl. SOF [Dkt. 147-2] No. 47 at 16.  This statement is inaccurate and the citations provided do not support it.  If Ms. Adams still had to provide a "final confirmation" from the Legal Division, it cannot be that Treasury already had approved Ms. Herron's move.  *Id.*  Moreover, the statement is belied by the record, which shows that Treasury and Fannie Mae were not close to finishing the mitigation plan, let alone jointly approving the arrangement.

[12] Ms. Herron omits the last sentence in this message from her statement of undisputed facts.  *See* Pl. SOF No. 48 at 16. It further belies her statement that Ms. Gertz and Mr. Welch told her on January 8 that everything was approved for her to become embedded at Treasury.  *See supra* n. 11.

At 4:10 p.m., Mr. Wilhelmy responded to Ms. Herron's earlier email and told her that "[Fannie Mae] Legal identified a number of issues that were raised with Treasury" and that Fannie Mae "would not be comfortable with the arrangement" until the issues were addressed and resolved.  Herron to Wilhelmy January 11 E-mail.  Ms. Herron replied in pertinent part that she was going to "follow up with Treasury to see if we can get it all resolved."  *Id.*  Later that evening, Mr. Schuppenhauer, Mr. Bryar, and Ms. Jardini agreed that Mr. Wilhelmy was going to tell Ms. Herron that "Treasury decided to bail on this after we discussed the compliance issues with them."  Bryar Dep. 2, Ex. 38 (Bryar to Schuppenhauer January 11 E-mail).

Notwithstanding Ms. Gertz's January 11 E-mail, Ms. Herron remained relentless on her goal of working at Treasury.  On January 13, 2010 at 9:23 p.m., Ms. Herron sent an e-mail on the topic of "Treasury Transition" to Mr. Schuppenhauer, "Can we talk about this tomorrow? I'm ready to escalate to [Executive Vice President Terry Edwards] and [CEO Mike Williams]."  Defs. MSJ R., Ex. 28 [Dkt. 146-45] (Herron to Schuppenhauer January 13 E-mail).  The next morning, January 14, 2010, at 8:24 a.m., Ms. Herron once again wrote Mr. Wilhelmy, "Any update? I have to go over transition timing with [Ms. Brown]."  Herron to Wilhelmy January 11 E-mail.

On January 14, Mr. Schuppenhauer called both Mr. Williams and Mr. Edwards to discuss Ms. Herron's situation.  Mr. Williams told Mr. Schuppenhauer that he should not spend any more time on the issue because Mr. Schuppenhauer had other priorities to focus on.  *See* Williams Dep. 1 at 399-400.  Mr. Williams wanted his "senior executive to be focused on his duties and responsibilities and not spending his time dealing with a contractor."  *Id.* at 406.  After

this conversation, Mr. Schuppenhauer terminated Ms. Herron's contract work at Fannie Mae on

January 15, 2010.[13]

Other Fannie Mae managers — specifically Rich McGhee and Patricia Fulcher

— explored the possibility of Ms. Herron working for them.  Neither Mr. McGhee nor Ms.

Fulcher offered Ms. Herron employment.  Ms. Herron claims she was not able to secure another

job at Fannie Mae because Mr. Wilhelmy told Mr. McGhee to stop recruiting her for a non-MHA

position.  *See* Response to SOF No. 46 at 46-47 (citing Pl. Opp'n, Ex. McGhee Dep. [Dkt. 151-

18] at 39, 45).  On January 19, 2010, Ms. Herron was placed on Fannie Mae's "Do Not Hire"

list.[14]  On January 21, 2010, Ms. Herron told Ms. Fulcher that she could "no longer engage with

Fannie Mae" and that "it would be a waste of our time for now to talk about working on other

projects."  Defs. MSJ. R., Ex. 31 [Dkt. 146-48] (Herron to Fulcher E-mail).  Ms. Fulcher replied,

---

[13] Ms. Herron claims it is unclear who terminated her because Mr. Schuppenhauer testified at his deposition, "[I]t wasn't my decision."  Schuppenhauer Dep. 2 at 491-492.  However, this testimony was in response to a vague question.  The deposition record is unclear as to whether Ms. Herron's counsel was asking about her termination or the decision to place her on a "Do Not Hire" list.  In any event, Mr. Schuppenhauer later clarified it was his decision to "offboard" Ms. Herron.  Defs. Opp'n, Ex. D [Dkt. 150-6] (Schuppenhauer Errata Sheet) at 2.  The record supports this proposition.  *See id.*; Williams Dep. 1 at 408-409.  To the extent the matter presents an issue of fact, it is not a material one.  *See* Fed. R. Civ. P. 56.

[14] Ms. Herron claims that "[i]t is disputed . . . who put Ms. Herron on the 'Do Not Hire' list."  Pl. Opp'n at 27.  However, the record is clear that the persons involved in this decision were Mr. Wilhelmy, Alyce Lemon and Brian Havekost from Fannie Mae's procurement office, and Mr. Bryar.  *See, e.g.*, Wilhelmy Dep. 136, 236-37, 241-42; Bryar Dep. 2 at 563.  The record does not directly tie any of the individual defendants to the decision. To the extent that this issue is genuinely disputed, it is immaterial to the resolution of the parties' cross-motions.  *See* Fed. R. Civ. P. 56.

"Sorry to hear that." *Id.*  Aside from this communication, there is no evidence that Ms. Fulcher

knew that Ms. Herron was placed on Fannie Mae's "Do Not Hire" list.[15]

        Ms. Herron claims that Defendants intentionally interfered with her employment

opportunities at Treasury, Fannie Mae, and in the mortgage finance industry.  Ms. Herron also

identifies herself as a whistleblower who was terminated due to her criticisms about Fannie

Mae's alleged mismanagement and waste of taxpayer funds.  Finally, Ms. Herron argues that

Defendants conspired to interfere with her employment opportunities and to terminate her.

Defendants first argue that Ms. Herron's intentional interference claim should be dismissed

because she did not have a valid business expectancy.  Defendants also assert that no one, other

than herself, considered her a whistleblower who had made protected disclosures about Fannie

Mae's actions.  In fact, during her short stint as a Fannie Mae contractor, Ms. Herron never

reported her allegations to the Special Inspector General of the TARP (SIGTARP) or Fannie

Mae Ethics as required under the Financial Agency Agreement Code of Conduct for Contractors.

*See* Defs. MSJ R., Ex. 35 [Dkt. 146-52] (Code of Conduct for Contractors).  Defendants also

point out that unresolved conflict of interest issues precluded her move to Treasury.  Defendants

argue that Ms. Herron was terminated due to her insubordination, as opposed to her criticisms

against Fannie Mae.

        Defendants move for summary judgment on Ms. Herron's claims, while Ms.

Herron cross-moves for partial summary judgment on Defendants' tenth affirmative defense that

---

[15] Ms. Herron purports to deny this fact, but does not offer any evidence showing otherwise.  *See* Response to SOF No. 48 at 48. The e-mail communication is unequivocally clear.

they were legally privileged or justified to refuse Ms. Herron's move to Treasury due to conflict of interest concerns.

## II.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.

When evaluating cross-motions for summary judgment, each motion is reviewed "separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law."  *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (citation and internal quotation marks omitted).  Neither party is deemed to "concede the factual assertions of the opposing motion."  *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (citation omitted)).  "[T]he court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  *Am. Ins. Ass'n v. HUD*, No. 13-cv-00966, 2014 WL 5802283, at *5 (D.D.C. Nov. 7, 2014) (internal quotation marks and citation omitted).

A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III. ANALYSIS

### A. Intentional Interference Claim

Ms. Herron alleges that Defendants improperly and intentionally interfered with her prospective business expectancies at Treasury, Fannie Mae, and in the mortgage finance industry. To prevail on a claim for tortious interference with a prospective economic advantage under District of Columbia law, Ms. Herron must show: "(1) the existence of a valid business relationship or expectancy . . . ; (2) knowledge of the relationship or expectancy on the part of the defendant[s]; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage." *Zelaya v. Unicco Serv. Co.*, 587 F. Supp. 2d 277, 286 (D.D.C. 2008) (citation omitted); *see also Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995). Ms. Herron has failed to demonstrate a genuine issue of material fact with regard to the first element of the claim. Ms. Herron cannot prevail if there were no prospective advantage or business expectancy with which to interfere.

A "prospective advantage" is best defined as "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and] are considered to be property." *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) (quoting *Carr v. Brown,* 395 A.2d 79 (D.C. 1978)). A "valid expectation" could arise, for example, from "informal assurances of being hired" or otherwise being on track to be "selected for the position." *Winder v. Erste*, No. 03-cv-2623 (JDB), 2005 WL 736639, at *14 (D.D.C. Mar. 31, 2005). An expectation that is "too remote" cannot be characterized as a valid "business expectancy" for purposes of an intentional interference claim. *Id.*

### 1.   Absence of a Valid Business Expectancy: Treasury and Fannie Mae

The Complaint alleges that Defendants "prevent[ed] Ms. Herron's hiring by Treasury" and interfered with her "valid business expectancy in working at the Department of Treasury."  Compl. ¶¶ 103, 106.  Ms. Herron avers that she ultimately wanted to work as a "direct employee" at Treasury and that Defendants knew this when she was brought in as a consultant on the MHA program.  *Id.* ¶¶ 103-104.  Ms. Herron disavowed this claim as she now asserts that her expectation was to "remain a Fannie Mae contractor, but [to work] onsite at Treasury." Defs. MSJ R., Ex. 14 [Dkt. 146-31] (Letter to Court) at 4; *see also* Pl. Opp'n at 35.[16] Ms. Herron wisely dropped her original claim because it is clear from the record that she could not have been immediately hired as a regular Treasury employee.  *See* Herron Dep. 2 at 834-835; *see also* Proposal of Embedded Contractor.  Any expectation of working at Treasury as a regular employee was simply "too remote."  *Winder*, 2005 WL 736639 at *14.

With respect to Ms. Herron's expectation of becoming embedded as a Fannie Mae contractor, Defendants argue that Ms. Herron "cannot maintain a valid business expectancy grounded in a prospective at-will relationship."  Mem. in Supp. of Defs. MSJ [Dkt. 145-1] (Defs. Mem.) at 9.  The Court agrees.  In *McManus v. MCI Commc'ns Corp.*, the D.C. Court of Appeals clearly stated, "[t]his court never has held that an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship, and we

---

[16] Ms. Herron asserts that "she never claimed that she should have been able to join Treasury as a Treasury employee."  Letter to Court at 4.  While the Complaint seems to be at odds with this statement, Ms. Herron's position at this stage is clear — Defendants allegedly interfered with her expectation to become embedded at Treasury as a Fannie Mae contractor.

do not do so now." 748 A.2d at 957. [17]  This district has consistently interpreted *McManus* to mean that D.C. law "would not recognize a tortious interference with prospective economic advantage claim based on an at-will employment agreement." *Metz v. BAE Sys. Tech. Solutions & Servs., Inc.*, 979 F. Supp. 2d 26, 31 (D.D.C. 2013) (citations omitted) (citing cases).  Ms. Herron does not dispute this point in her opposition.  Accordingly, it is conceded.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd,* 98 Fed. App'x. 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citations omitted).

Ms. Herron argues that she was not an at-will contractor at Fannie Mae.  She claims that "[t]he existence of . . . renewable work orders takes [her] out of the at-will context and allows her to bring a tortious interference claim based on defendants' interference with her continued employment at Fannie Mae."  Pl. Opp'n at 35.  The argument is unsupported by the record and lacks merit for two main reasons.  First, Ms. Herron's wrongful termination claim relies exclusively on the fact that she was terminated in violation of public policy — an exception to the at-will employment doctrine.  *See* Compl. ¶ 1.  Ms. Herron has consistently invoked this narrow exception throughout this litigation.  *See, e.g.*, *id.*; Pl. Opp'n at 38; Pl. Memo in Supp. of Mot. to Dismiss [Dkt. 18-1] at 21.  If Ms. Herron were not an at-will Fannie

---

[17] In 2014, the D.C. Court of Appeals stated that "*McManus* left open the issue of whether an at-will employee may pursue [a claim of tortious interference with a prospective advantage]." *Little v. D.C. Water & Sewer Auth.*, 91 A.3d 1020, 1029-30 & n.10 (D.C. 2014).  However, *Little* did not address the question either.

Mae contractor, she would not have to rely on this exception to bring her wrongful termination claim. Her new argument is self-contradictory at best.

Second, the record amply supports the fact that Ms. Herron was an at-will Fannie Mae contractor. It is well established that:

> In the District of Columbia, absent express language indicating particular terms or duration of employment, the employment relationship is presumed to be at-will . . . This presumption applies unless the parties "state clearly their intention to limit the employer's right to terminate," such as by a contract provision setting out employment for a fixed term or language that allows termination only for cause.

*Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 67-68 (D.D.C. 2005) (citations omitted). In light of this definition, it is clear that Ms. Herron's employment relationship with Fannie Mae, which itself was based on Fannie Mae's relationship with ICon, was at-will. There is no evidence in the record that Ms. Herron's assignment through ICon was for a "fixed term" or that she could only be terminated "for cause." *Id.* Ms. Herron concedes that her job as a consultant was for an "open timeframe, not fixed." Pl. Opp'n at 4.

In fact, Ms. Herron's contract with ICon stated in pertinent part:

> I acknowledge that I am not a Fannie Mae employee and that I am not entitled or eligible to receive any of the compensation, benefits, or privileges that Fannie Mae's officers or employees receive. I also acknowledge that *I have no expectation of employment at Fannie Mae*.

> I further acknowledge and agree that I am employed by Vendor [ICon] and that I am only providing *temporary services* on a Fannie Mae project as a contractor.

Defs. Mot. to Dismiss [Dkt. 6], Ex. A. [Dkt. 6-3] (ICon Contract) at 3 (emphasis added). In addition, the application for employment with ICon, signed by Ms. Herron, stated in part: "I agree that if I am hired by ICon, I will be an at-will employee, meaning that either ICon or I may

*end the employment relationship at any time with or without cause or notice*." Defs. MSJ R., Ex. 8 [Dkt. 146-25] (Employment Application) (emphasis added). The existence of renewable work orders and her status as a W-2 contractor do not transform the legal nature of Ms. Herron's employment relationship with Fannie Mae — particularly when these orders were not automatically approved and when there is undisputed evidence that there were plans to offboard Ms. Herron in March 2010. *See, e.g.*, Defs. MSJ R., Ex. Fulcher Dep. [Dkt. 146-8] (Fulcher Dep. 1) at 196-97; Herron Dep. 1 at 302-3, 369; Brown to Schuppenhauer December 18 E-mail. The text of the signed contract and ICon's employment application was clear. Ms. Herron's at-will contractor status is evident under D.C. law and is properly established in the record.

Ms. Herron's claim against Fannie Mae fails for an additional simple reason. Under D.C. law, "an employer cannot interfere with its own contract." *Hopkins v. Blue Cross & Blue Shield Assoc.*, No. 10-cv-900 (JDB), 2010 WL 5300536, at *8 (D.D.C. Dec. 21, 2010) (quoting *McManus*, 748 A.2d at 958) (other citations omitted). "Even were we to afford [Ms. Herron] contractual protections based on her alleged expectancy (which we are not willing to do), [Ms. Herron] still could not survive summary judgment on this record . . . because it is axiomatic that an employer cannot interfere with its own contract." *McManus*, 748 A.2d at 957-58 (citing *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads*, 565 A.2d 285, 290 (D.C. 1989); *Press v. Howard Univ.,* 540 A.2d 733, 736 (D.C. 1988)).

Since it is clear that Ms. Herron was an at-will Fannie Mae contractor and it is undisputed that a plaintiff cannot maintain a valid business expectancy grounded in an at-will relationship, it follows that Ms. Herron did not have a valid business expectancy in continuing an at-will relationship with Fannie Mae. *See Metz*, 979 F. Supp. 2d at 31; *see also McManus*, 748 A.2d at 957-58. This holds true regardless of whether Ms. Herron was working at Treasury as an

embedded contractor or at Fannie Mae on non-HAMP projects.  The Court need not address the parties' remaining arguments concerning this claim.  Ms. Herron's claim for intentional interference fails as a matter of law.

### 2.   Absence of a Valid Business Expectancy: Mortgage Finance Industry

Ms. Herron also argues in passing that Defendants interfered with her attempts to obtain employment outside of Fannie Mae and Treasury.  Specifically, Ms. Herron claims that she was "blackballed" by Defendants "in the industry."  *See* Compl. ¶¶ 16-17.  In her opposition, Ms. Herron included a series of facts under a section titled "Defendants Interfered With Ms. Herron's Other Employment Prospects."  Pl. Opp'n at 29-30.  However, her legal arguments do not address any expectancy outside of Fannie Mae.  *See* Pl. Opp'n 35-38. The brief only refers to her alleged "expectancies at both Treasury and Fannie Mae."  *Id.* at 36.  Simply put, Ms. Herron does not allege or identify any valid business expectancy in the general mortgage finance industry.

A mere recitation of facts does not give rise to a legal argument. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).  "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or forever hold its peace."  *Id.* (citations and quotations omitted).  Even if this Court were to raise the argument from the recited facts, like a phoenix from the ashes, there is nothing in the record that could support a finding that Ms. Herron had a valid business expectancy outside of Fannie Mae.

Ms. Herron mentions a single job opportunity that she allegedly pursued with the Collingwood Group, a financial services consulting company.  Ms. Herron relies on a conversation with the company's CEO, Timothy Rood.  Ms. Herron "contacted him about working in some capacity with his company."  Pl. Opp'n at 30.  As a result of "negative responses" from "contacts at Fannie Mae," Mr. Rood told Ms. Herron that she "appeared to be radioactive" and that she should "lie low."  *Id.*  However, "working in some capacity" at the Collingwood Group does not rise to the level of a business expectancy that is "commercially reasonable to anticipate, [and is] considered to be property."  *McManus*, 748 A.2d at 957.  There is no evidence that Ms. Herron received any "informal assurances" from Mr. Rood that she was going to be hired or that she was on track to be "selected for [a particular] position" in the company.  *Winder*, 2005 WL 736639, at *14.  Moreover, Ms. Herron's allegation that she was unable to get any references from Fannie Mae "so prospective employers in the mortgage finance industry were unable to obtain independent verification of her accomplishments" is irrelevant. Pl. Opp'n at 29.  Fannie Mae was certainly not obliged to provide a positive reference for Ms. Herron.  Defendants' alleged interference with unnamed business opportunities cannot give rise to a tortious interference claim.

In the absence of a valid, commercially reasonable business expectancy, judgment will be entered in favor of Defendants on the intentional interference claim.

### B.  Wrongful Termination Claim

Generally, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all."  *Ervin v. Howard Univ.*, 562 F. Supp. 2d 58, 72 (D.D.C. 2008) (citation omitted).  However, D.C. law "recognizes an intentional tort for wrongful discharge based upon a 'very narrow' public policy exception to the employment-at-will

doctrine." *Id.* (quoting *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 34 (D.C. 1991)).

Under this exception, there is "a cause of action for wrongful termination where an at-will

'employee acted in furtherance of a public policy' . . . and was terminated solely on the basis of

such conduct." *Alibalogun v. First Coast Sec. Sols., Inc.*, 67 F. Supp. 3d 211, 217 (D.D.C. 2014)

(quoting *Myers v. Alutiiq Int'l Solutions, LLC,* 811 F. Supp. 2d 261, 266 (D.D.C. 2011)) (other

citations omitted).

An at-will employee raising a wrongful termination claim under this public policy

exception must show:

> (1) that a claimed public policy is "clearly reflect[ed]" and "firmly
> anchored either in the Constitution or in a statute or
> regulation[,]" *Fingerhut v. Children's Nat'l Med. Ctr.,* 738 A.2d
> 799, 803 n. 7 (D.C. 1999) (citing *Carl* [*v. Children's Hosp.*]*,* 702
> A.2d 159, 162 (D.C. 1997) (Terry, J., concurring)), and
>
> (2) "there must be a close fit between the policy thus declared and
> the conduct at issue in the allegedly wrongful termination[,]"
> *Robinson* [*v. Securitas Servs., Inc.*]*,* 819 F.Supp.2d 18, 20
> (D.D.C. 2011) (quoting *Carl,* 702 A.2d at 164 (Terry, J.,
> concurring)).

*Alibalogun*, 67 F. Supp. 3d at 217. The public policy exception for at-will employees has been

applied in various fact patterns, including: "(1) refusing to violate statutory or regulatory laws;

(2) reporting wrongdoing in government contracting; (3) refusing to participate in partisan

political and legislative activities in violation . . . of the Internal Revenue Code and Department

of Labor regulations; (4) following District of Columbia food safety laws; and (5) threatening to

report improper storage of pharmaceuticals." *Id.* (internal citations omitted).

These cases all involved a public policy that was both "clearly reflected" and

"firmly anchored" in a statute or regulation "that [did] not provide its own remedy." *Clayton v.*

*District of Columbia*, 931 F. Supp. 2d 192, 205 (D.D.C. 2013) (quoting *Stevens v. Sodexo, Inc.*,

846 F. Supp. 2d 119, 126 (D.D.C. 2012)) (other citation omitted).  In other words, "[e]ven where there is a showing of a clearly identifiable policy, the D.C. Court of Appeals has refused to find new exceptions to the doctrine of at-will employment where the legislature has already 'creat[ed] a specific, statutory cause of action to enforce' the public policy at issue."  *Id.* (quoting *Carter v. District of Columbia,* 980 A.2d 1217, 1225-26 (D.C. 2009)) (other citation omitted).

In the instant case, Ms. Herron claims that she was terminated "solely because she opposed Fannie Mae's contract violations, gross waste of public funds, and gross mismanagement, which violated its legal duties to the United States government."  Compl. ¶ 90.[18]  Defendants argue that Ms. Herron's wrongful termination claim must be dismissed because: (1) she failed to identify proper sources of public policy; (2) her criticisms of Fannie Mae's practices — namely, the imposition of unnecessary burdens on servicers, the use of stated income for trial modifications, and the failure to announce immediately the extension of the TARP/MHA's enrollment deadline for servicers — were not protected disclosures of gross waste or mismanagement; and (3) her insubordination provides an independent basis for termination so that it cannot be said that she was terminated solely on the basis of the alleged protected conduct. Ms. Herron responds that Fannie Mae's arguments do not survive scrutiny and that Defendants' motion for summary judgment should be denied.

### 1.  The "Clearly Reflected" and "Firmly Anchored" Analysis

Ms. Herron identified four statutes as sources of public policy supporting her wrongful termination claim: (1) the False Claims Act (FCA), 31 U.S.C. § 3729(a); (2) the Major

---

[18] When briefing Fannie Mae's motion to dismiss, Ms. Herron conceded that Fannie Mae's alleged violations of its contract with Treasury were "not the public policy source of Ms. Herron's claim."  Pl. Opp'n to Mot. to Dismiss [Dkt. 18] at 22.

Fraud Act, 18 U.S.C. § 1031; (3) the criminal prohibition on making false statements, 18 U.S.C § 1001(a); and (4) the Emergency Economic Stabilization Act of 2008 (Stabilization Act), 12 U.S.C. §§ 5201, 5213.  *See* Pl. Opp'n to Mot. to Dismiss at 22.  Defendants argue that none of these statutes is applicable because they do not support Ms. Herron's alleged public policy of disclosing gross mismanagement and a gross waste of public funds.[19]  Ms. Herron contends that Defendants are estopped from raising these arguments because the Court rejected them when denying Defendants' motion to dismiss.

Contrary to Ms. Herron's estoppel argument, this Court never determined whether these four statutes were legitimate sources of public policy for her wrongful termination claim. The Court denied Defendants' motion to dismiss without prejudice to allow "all the facts [to] come to light."  Order Denying Mot. to Dismiss [Dkt. 30] at 2.  The Court "note[d] multiple questions of fact that cannot be resolved without resort to full discovery . . . ."  *Id.*  Now that discovery is over, the Court may consider the entirety of the record and decide whether there any statutes that support Ms. Herron's alleged public policy as required under D.C. law.

Even assuming *arguendo* that the Court's denial of Defendants' motion to dismiss also constituted a rejection of Defendants' arguments, there is no authority for the proposition that this Court is barred from reconsidering the arguments after discovery.  According to Ms. Herron, "[u]nder D.C. Circuit precedent, this Court *cannot* reconsider defendants' arguments at this stage" pursuant to the law of the case doctrine.  Pl. Opp'n at 40 (emphasis added).  Her statement is incorrect.  The law of the case doctrine is "a prudential rule rather than a

---

[19] To be clear, Fannie Mae denies that it engaged in either gross mismanagement or gross waste of public funds.

jurisdictional one; in the words of Justice Holmes, the doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Crocker v. Piedmont Aviation,* 49 F.3d 735, 739-40 (D.C. Cir. 1995) (quoting *Messenger v. Anderson,* 225 U.S. 436, 444 (1912)).  The Court denied Defendants' motion without prejudice and did not finally rule on Defendants' contention that Ms. Herron's alleged sources of public policy were insufficient as a matter of law.  Accordingly, the Court will address the argument now.

### The FCA and the Major Fraud Act

Defendants first argue that the FCA and the Major Fraud Act cannot be sources of public policy in this case because they provide their own remedies.  Courts have refused to recognize a public policy exception when the purported protected conduct falls "squarely under the aegis" of the claimed statute.  *Carter*, 980 A.2d at 1226.  Where the legislature has provided a remedy, courts should refrain from creating "a new exception to the at-will employment doctrine" and "defer to the legislature's prerogatives."  *Id.*; *see, e.g.*, *Clayton*, 931 F. Supp. 2d at 205 ("[T]to the extent that [the plaintiff] claims that she was wrongfully terminated because she reported fraud, waste, and abuse, her wrongful termination claim fails because this conduct also violates the [D.C. Whistleblower Protection Act (DC-WPA)] and the DC-WPA provides a remedy for the illegal conduct."); *Kakeh v. United Planning Org., Inc.*, 537 F. Supp. 2d 65, 72 (D.D.C. 2008) (holding that the public policy exception did not apply "where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation.") (citation omitted).

The rule that courts must "defer to the legislature's prerogatives" where there is a statutory remedy applies with equal force when a plaintiff cannot assert a claim under the statute. *Carter*, 980 A.2d at 1226.  In *Carter*, the D.C. Court of Appeals held that the plaintiff could not

37

rely on the DC-WPA for public policy support of a common law claim because the statute

provided the exclusive remedy, despite the fact that plaintiff's claim was time-barred. *Id.* at

1226, n.27.  Similarly, in *Hicks v. Association of American Medical Colleges*, the Court held

that, although plaintiff's activity was not protected by the Fair Labor Standards Act and the D.C.

Minimum Wage Act, "those statutes provide[d] plaintiff's exclusive remedy and preclude[d]

application of wrongful discharge in violation of public policy . . . ."  503 F. Supp. 2d 48, 55

(D.D.C. 2007).

> In the instant case, the FCA and the Major Fraud Act provide remedies to a

plaintiff who has been retaliated against for reporting a violation of their provisions.  *See* 31

U.S.C. § 3730(h)(2) (codifying the FCA's anti-retaliation provision) and 18 U.S.C. § 1031(h)

(codifying the Major Fraud Act anti-retaliation provision).  Ms. Herron asserts that she could not

bring an FCA relator or retaliation claim "because her disclosures were not of specific invoices"

or false reports so that the "existence of remedies under the FCA d[oes] not preclude her

common-law claim."  Pl. Opp'n at 40.  She connects the statute and her actions by arguing that

"the overall principle of the FCA is to prevent the stating of false invoices or claims to the

government, and that interest was properly vindicated by Ms. Herron's disclosures of gross

waste of public funds."  *Id.*  It follows that, according to Ms. Herron, "the FCA remains a

legitimate public policy source for the wrongful termination claim."  *Id.* [20]  The Court disagrees.

> *Carter* and *Hicks* stand for the proposition that where there is a statutory remedy,

it is exclusive and the statute cannot serve as a source of public policy to create a new public

---

[20] Although Ms. Herron only refers directly to the FCA, it is assumed she intended to extend her reasoning to the Major Fraud Act.

policy exception to the at-will doctrine.  "The common denominator in all of these cases is the existence of specific laws or regulations that clearly reflect a policy *prohibiting the activity about which the employee complained*, whether or not the employer actually violated the law or regulation."  *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 249 (D.D.C. 2015) (emphasis added).  The activity about which Ms. Herron complained was Fannie Mae's alleged gross mismanagement and gross waste of public funds.  Notably, the terms gross mismanagement and gross waste do not appear in the FCA or the Major Fraud Act.[21]

Both the FCA and the Major Fraud Act prohibit fraudulent conduct and it is clear that "[d]isclosing wasteful procedures or practices," as Ms. Herron claims to have done in this case, "does not amount to an investigation of false or fraudulent claims."  *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 98 (D.D.C. 2011).  Ms. Herron has conceded that "*none* of the[] seven categories [of FCA prohibitions] relates to any of Ms. Herron's disclosures to Treasury or her internal protests within Fannie Mae, since she instead protested Fannie Mae's waste of government funds, and gross mismanagement of government mortgage programs under [HAMP] and related programs."  Pl. Opp'n to Renewed Mot. to Dismiss [Dkt. 37] at 9 (emphasis in original).[22]  If Ms. Herron's so-called disclosures of "gross mismanagement" and "gross waste"

---

[21] Ms. Herron took these terms directly from the federal and D.C. whistleblower statutes.  *See* 5 U.S.C. § 2302(b)(8)(ii) (referring to "gross mismanagement" and "gross waste of funds"); D.C. Code § 1-615.52(a)(6) (referring to "gross mismanagement" and "[g]ross misuse or waste or public resources or funds").  Ms. Herron does not, and could not, rely on these whistleblower statutes for public policy support because they also provide their own remedy to aggrieved parties in the form of anti-retaliation provisions.  *See* 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 1221(a); D.C. Code § 1-615.54.

[22] Despite this clear concession, Ms. Herron now argues that Defendants violated "the policy behind the FCA that Fannie Mae not file false reports with the government" because certain officials may have benefited economically from their wasteful practices.  *See* Pl. Opp'n at 40. The argument is a red herring.  Even if Defendants benefited from such practices, there is no

do not relate to the categories listed in the FCA (or the Major Fraud Act), it cannot be that Ms. Herron's claimed public policy is clearly reflected and firmly anchored in these statutes.  *See Leyden*, 83 F. Supp. at 249 (stating that the statute must clearly reflect a policy that prohibits "the activity about which the employee complained . . . ."); *see also Washington v. Guest Servs., Inc.*, 718 A.2d 1071, 1073, 1080 (D.C. 1998) (applying public policy exception where D.C. law prohibited the activity about which the plaintiff complained — namely, that her co-worker at a retirement home "sprayed the residents' food with a poisonous cleaning fluid" in violation of D.C. law).

Just as the plaintiff in *Sorrells* — where the D.C. Court of Appeals refused to create a public policy exception under the D.C. Human Rights Act — Ms. Herron does not rely on any specific provision of the FCA and the Major Fraud Act.  565 A.2d at 289.  Instead, "she asks this court to broaden the policies expressed in [both statutes] and to fill a perceived gap in [them]."  *Id.*  "This is an invitation to judicial activism," and "insofar as [Ms. Herron's] concerns are unprotected by [these statutes]," this Court will not "rewrite [them] or extend [their] coverage beyond the limits set by the legislature."  *Id.*

### Criminal Prohibition against False Statements

The same analysis applies to the federal criminal prohibition against false statements, 18 U.S.C § 1001(a), which covers "false, fictitious, or fraudulent" representations to the U.S. Government.  Ms. Herron does not address Defendants' argument at summary judgment

---

evidence that Defendants filed any false invoices or reports to Treasury.  There is also no evidence that Ms. Herron complained or made any disclosures regarding Defendants' "personal benefit."  *Id.*  Even then, since the FCA and the Major Fraud Act provide their own remedies, Ms. Herron cannot rely on them for a public policy to support her wrongful discharge claim.

that her claimed public policy is not firmly anchored in that statute and, therefore, under the law

of this Circuit, the argument is conceded.  *See Hopkins*, 284 F. Supp. 2d at 25.  In any event, the

Court agrees with Defendants that the statute does not cover "gross waste" or "gross

mismanagement" of public funds and Ms. Herron's alleged disclosures do not relate to the

prohibition expressed in this criminal statute.  *See Leyden*, 83 F. Supp. at 249.  Accordingly, Ms.

Herron's reliance on the statute is equally misplaced.

### Sections 5201 and 5213 of the Emergency Economic Stabilization Act

In her opposition to Defendants' motion for summary judgment, Ms. Herron

indicates that she is relying on the Emergency Economic Stabilization Act, 12 U.S.C. §§ 5201

and 5213, as her source of public policy.  Specifically, Ms. Herron argues that the purpose of the

Stabilization Act, as articulated in these sections, was to "preserve homeownership" while

"protecting the interests of taxpayers" and "providing public accountability."  Pl. Opp'n at 39

(citing Compl. ¶ 85; Response to SOF No. 6 at 3-4).  This is the extent of Ms. Herron's skeletal

argument.  Defendants respond that the actions about which Ms. Herron complained "actually

*furthered* the purpose of [the Stabilization Act]."  Defs. Reply [Dkt. 157] at 15.

Assuming that the actions about which Ms. Herron complained rose to the level of

gross waste or gross mismanagement, the relevant inquiry is whether the claimed public policy

of disclosing or protecting against the gross mismanagement and the gross waste of public funds

is "clearly reflected" and "firmly anchored" in §§ 5201 and 5213.  Notwithstanding the

emaciated nature of Ms. Herron's argument, the Court finds that §§ 5201 and 5213 do reflect

such a policy.  Section 5201 provides, *inter alia*, that the purpose of the Act is "to preserve[]

homeownership and promote[] jobs and economic growth" and "maximize[] overall returns to

the taxpayers of the United States." 12 U.S.C. § 5201.  Similarly, § 5213 refers to the importance

of:

> (1)  protecting the interests of taxpayers by maximizing overall returns and minimizing the impact on the national debt;
>
> (2)  providing stability and preventing disruption to financial markets in order to limit the impact on the economy and protect American jobs, savings, and retirement security;
>
> (3)  the need to help families keep their homes and stabilize communities;
>
> (4)  in determining whether to engage in a direct purchase from an individual financial institution, the long-term viability of the financial institution in determining whether the purchase represents the most efficient use of funds under this chapter;
>
> . . . .

12 U.S.C. § 5213.

These specific provisions denote Congress's goals of avoiding foreclosures,

promoting economic growth, protecting taxpayers' interests, stabilizing the financial markets,

and ensuring the efficient use of funds.  As a fiduciary to Treasury in charge of administering the

MHA program, Fannie Mae's alleged gross mismanagement and waste of public funds would

directly frustrate the underlying statutory goals of the Stabilization Act.  Regardless of whether

Fannie Mae's actions in fact violated or furthered the Act, Ms. Herron's claimed public policy

directly relates to the goals expressed in §§ 5201 and 5213.  Accordingly, the Court concludes

that the Stabilization Act's goal of preserving homeownership and revitalizing the economy

through the efficient use of public funds and the maximization of overall returns reflects a policy

in favor of disclosing Fannie Mae's alleged gross mismanagement of the MHA program and

gross waste of public funds.  *See Liberatore v. Melville Corp.*, 168 F.3d 1326, 1331 (D.C. Cir.

1999) and *Washington*, 718 A.2d at 1080 (relying on various federal and state law provisions concerning the proper storage and handling of food and drugs to acknowledge a policy in favor of protecting the public health).

### 2. The "Close Fit" Analysis

While the Stabilization Act contains a mandate of public policy against the gross mismanagement and waste of public funds alleged in the instant case, the policy by itself is not enough for this Court to recognize an exception to the at-will employment doctrine.  D.C. law also requires "a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Carl*, 702 A.2d at 164.  Under this analysis, a court "'need only decide' whether the firing, because of the plaintiff's conduct, 'is sufficiently within the scope of the policy embodied in the statute so that a court may consider imposing liability on [the defendant] for [the plaintiff's] termination for otherwise permissible reasons.'" *Riggs v. Home Builders Inst.*, 203 F. Supp. 2d 1, 21 (D.D.C. 2002) (quoting *Carl*, 702 A.2d at 165).

Defendants argue that there was no "close fit" between Ms. Herron's conduct and her claimed public policy because: (1) "nobody understood Plaintiff to have been making any complaints, and in fact, Plaintiff never officially reported any issues; and (2) in any event, Plaintiff's alleged complaints do not constitute protected 'disclosures,' of 'gross waste' or 'gross mismanagement,' as defined by case law." Defs. Mem. at 25.  Ms. Herron disputes Defendants' characterization of the record.  Ms. Herron asserts that she made repeated complaints and that Fannie Mae's actions rose to the level of gross waste and mismanagement.

### Ms. Herron Was Not a Whistleblower Who Made Protected Disclosures

There is no question that terminating Ms. Herron for disclosing Fannie Mae's alleged gross waste of public funds or gross mismanagement of the MHA program would

undermine the Stabilization Act's goals.  However, Ms. Herron's criticisms did not implicate the

claimed public policy embodied in §§ 5201 and 5213.  Ms. Herron correctly identifies the

relevant legal issue in the "close fit" analysis:  "The legal issue is not whether Ms. Herron

'criticized' Fannie Mae, but whether she made *disclosures* both within Fannie Mae and to

Treasury, about Fannie Mae's gross mismanagement and gross waste of public funds in Fannie

Mae's administration of the MHA program."  Response to SOF No. 69 at 71 (emphasis added).

If Ms. Herron only "criticized" or "trashed" Fannie Mae's policy decisions, then Fannie Mae did

not violate the claimed public policy when it terminated Ms. Herron's contract for those or other

reasons.  For there to be a "close fit" between Ms. Herron's actions and her claimed public

policy, Ms. Herron must have disclosed gross waste and gross mismanagement.

Ms. Herron repeatedly states that she made "criticisms" of Fannie Mae's

decisions and that she was terminated because Mr. Schuppenhauer and Ms. Brown "develop[ed]

concerns that Ms. Herron had criticized Fannie Mae to Treasury."  Opp'n at 17; *see also id.* at

11, 13, 18, 37, 43.  Ms. Herron also relies heavily on Mr. Schuppenhauer's testimony that Ms.

Herron had "trashed" Fannie Mae to Treasury and that "Ms. Herron's criticism of Fannie Mae

may have affected his views about Ms. Herron's proposed transition to Treasury."  Bromwich

Report at 22-23.  But criticisms are not closely tied to the claimed public policy and do not

constitute protected activity.  Simply put, the fact that Ms. Herron was critical of the trial

modification program and Fannie Mae's administration of HAMP is not dispositive of the

question of whether she made any disclosures about gross waste or mismanagement.

While Ms. Herron considers herself a "whistleblower" who made protected

disclosures, it is noteworthy that no one else perceived her as a whistleblower making protected

disclosures, which would be necessary to show such a motivation behind her termination.  Ms.

44

Herron points to three persons whose testimony allegedly demonstrates that they recognized her

as a whistleblower.  The first two instances are deposition testimony by Patricia Fulcher, a Vice

President at Fannie Mae, and Rich McGhee, a Senior Vice President at Fannie Mae.

During Ms. Fulcher's deposition, Ms. Herron's counsel asked her the following

leading question: Did Ms. Herron "overall raise[] with [Mr. Schuppenhauer] the fact that Fannie

Mae's requirements on servicers were causing them to potentially lose credibility?"  *Id.*, Ex.

Fulcher Dep. [Dkt. 151-12] (Fulcher Dep. 2) at 94-95.  Ms. Fulcher answered, "I don't know that

she said 'lose credibility.'  I don't know that.  I don't know that she used 'credibility' in her

conversation."  *Id.* at 95.  Ms. Herron's counsel followed with another leading question,

"Something of that nature, whether those words or not, something in the nature of that Fannie

Mae is going to lose standing, credibility, lose a good relationship with servicers if they put

unnecessary requirements on them?"  *Id.*  Ms. Fulcher, in turn, answered: "I know she raised

concerns to [Mr. Schuppenhauer] about her concerns . . . Concerns about program execution in

general.  I don't know that it was specifically Fannie Mae's relationship with servicers."  *Id.*

Thus, in response to direct, leading questions about Fannie Mae's relationship

with servicers, Ms. Fulcher said only that Ms. Herron had raised some unspecified "concerns"

with Mr. Schuppenhauer.  Contrary to Ms. Herron's assertion, this is not evidence that Ms.

Fulcher perceived Ms. Herron as a whistleblower who made protected disclosures about gross

waste or mismanagement.

Similarly, Ms. Herron's reliance on Mr. McGhee's testimony is misplaced.

During Mr. McGhee's deposition, Ms. Herron's counsel asked Mr. McGhee whether he recalled

any discussions or conversations "in which Ms. Herron says it's important to tell servicers that

the deadline for HAMP [was] extended."  McGhee Dep. at 71.  Mr. McGhee's response was that

he did not recall such a conversation.  *See id.*  In response to another question regarding Ms.

Herron's criticism of Fannie Mae's relationship with servicers, Mr. McGhee said, "I don't

remember any of the specifics of the debate.  What I would tell you is that [Ms. Herron] and

others were critical of the results, critical of some of the approaches.  And what I remember is

that we actually changed the way we ran the program based on the results of some of the

debates."  *Id.* at 72.  As with Ms. Fulcher's testimony, Mr. McGhee did not provide any details

about Ms. Herron's criticisms and he made no mention of alleged disclosures of gross waste or

mismanagement.  Mr. McGhee clearly viewed Ms. Herron as someone who was "critical" of

certain policy decisions.  The Court fails to see how this testimony supports Ms. Herron's

position.  To conclude otherwise would render every complaint about a manager's decisions a

protected disclosure.

       The third piece of evidence that Ms. Herron cites to support her position that

others perceived her as a whistleblower is the fact that Mr. Williams and Mr. Schuppenhauer

directed that no communications were to be made to Treasury without their knowledge or

approval.  *See* Pl. Opp'n at 11-12.  Once again, it is unclear how this evidence shows there is a

genuine issue of material fact regarding whether others perceived Ms. Herron as a whistleblower

who made protected disclosures, rather than wanting a clear relationship with Treasury.

       There is no other evidence in the record showing that anyone at Fannie Mae or

Treasury believed that Ms. Herron was making any protected disclosures of gross waste or

mismanagement.  In addition to Mr. McGhee and Ms. Fulcher, Mr. Bryar and Ronald Rohrbach,

Vice President and Chief Technology Architect at Fannie Mae, testified that they could not recall

any complaint or disclosure by Ms. Herron concerning Fannie Mae's management of the MHA

program.  *See, e.g.*, Bryar Dep. 1 at 337, 441, 456-57; Defs. MSJ R., Ex. Rohrbach Dep. [Dkt.

146-13] (Rohrbach Dep.) at 30-33, 42, 47.  Ms. Herron does not provide any evidence indicating

otherwise.  With respect to Defendants Mr. Schuppenhauer, Ms. Brown, and Ms. Jardini, Ms.

Herron asserts that they "agreed that Ms. Herron had criticized or 'trashed' Fannie Mae's

performance to Treasury, which demonstrates that defendants also viewed Ms. Herron as a

whistleblower."  Response to SOF No. 75 at 77.  The problem is that criticizing or trashing

Fannie Mae is not a protected activity.  Ms. Herron cannot be described as a whistleblower just

for expressing mere disagreements over Fannie Mae's policy decisions, as well as

recommendations as to what Fannie Mae could do to improve its relationship with servicers.

        In her opposition, Ms. Herron contends that policy disputes can still be

whistleblowing disclosures.  She cites the Whistleblower Protection Enhancement Act of 2012

for the proposition that disclosures "concerning policy decisions" are covered if the employee

"reasonably believed that the disclosure evidences (i) any violation of any law, rule, or

regulation; (ii) or gross mismanagement, a gross waste of funds, an abuse of authority or a

substantial and specific danger to public health or safety."  5 U.S.C. § 2302(a)(2)(D).  Although

Ms. Herron correctly quotes the law, there are two problems with her argument.  First, Ms.

Herron does not rely on this statute — which provides its own remedy to aggrieved parties — for

public policy support.  Second, the D.C. Court of Appeals has made clear that there is no

"reasonable belief" defense in the context of a wrongful termination claim.  *Rosella v. Long Rap,*

*Inc.*, 121 A.3d 775, 779 (D.C. 2015) (rejecting the argument that an employee who "had a

reasonable belief that at least some of [his] employer's accounting practices were likely

unlawful" would be sufficient to establish that he was terminated in violation of public policy).

As a result, to prevail on her common law claim, Ms. Herron must have disclosed an actual

violation of the policy reflected and anchored in the Stabilization Act, regardless of whether she

reasonably believed that her alleged criticisms disclosed Fannie Mae's gross waste or

mismanagement.  *See id.*; *see also Leyden*, 83 F. Supp. at 249 (stating that the claimed public

policy must actually prohibit the activity about which the employee complained).

               Moreover, Ms. Herron's contacts at Treasury testified that they could not recall

Ms. Herron complaining about Fannie Mae.  For example, Ms. Caldwell could not point to a

single instance in which Ms. Herron complained to her or anyone else about Fannie Mae's

mismanagement of the MHA/ TARP program.  *See* Defs. MSJ R., Ex. Caldwell Dep. [Dkt. 146-5]

(Caldwell Dep. 1) at 35, 44-46, 50-53.  Ms. Caldwell could not recall any allegation of Fannie

Mae employees violating the Stabilization Act or any other statute by engaging in fraud or in a

waste of public funds.  *Id.*; *see also id.* at 58-59.  Ms. Caldwell also testified that had she been

aware of such allegations, the proper recourse would have been to report them to SIGTARP.  *Id.*

at 54.  However, no one made any reports to SIGTARP prior to Ms. Herron's termination.[23]

Similarly, Ms. Gertz testified she could not recall Ms. Herron ever making any disclosure or

complaint concerning Fannie Mae's alleged mismanagement or waste of public funds.  *See* Defs.

MSJ R, Ex. Gertz Dep. [Dkt. 146-8] (Gertz Dep. 1) at 265-268.  Ms. Gertz added that she would

likely remember complaints of such a serious nature and that she would have referred them to

Treasury's legal division.  *See id.*  As a result, the record shows that none of the persons to whom

Ms. Herron allegedly complained regarded Ms. Herron as a whistleblower making protected

---

[23] Under the Financial Agency Agreement Code of Conduct for Contractors, Ms. Herron also
was required to report any allegation of illegal conduct to Fannie Mae Ethics.  *See* Code of
Conduct for Contractors.

disclosures.  Ms. Herron does not properly dispute or undermine any of this evidence and, therefore, fails to raise a genuine issue of material fact.[24]

### No Disclosures of Gross Waste or Mismanagement

Ms. Herron took the terms "gross mismanagement" or "gross waste of funds" directly from the Whistleblower Protection Act and the DC-Whistleblower Protection Act.  *See* 5 U.S.C. § 2302(b)(8)(ii); D.C. Code § 1-615.52(a)(6).  In their briefs, the parties look to federal whistleblower law for the definition of these terms.  Specifically, Defendants rely on several Merit Systems Protection Board cases for guidance on this issue.  "Gross mismanagement" is defined as "a management action or inaction which creates substantial risk of significant adverse impact upon agency's inability to accomplish its mission."  *Carolyn v. Dep't of Interior*, 63 M.S.P.R. 684, 691 (1994), *overruled on other grounds by Thomas v. Dep't of Treasury*, 77 M.S.P.R. 22 (1998).  Gross mismanagement does not include "management decisions which are merely debatable, nor does it mean action or inaction which constitutes simple negligence or wrongdoing."  *Shriver v. Dep't of Veterans Affairs*, 89 M.S.P.R. 239, 243 (2001).  "Mere differences of opinion between an employee and his agency superiors as to the proper approach

---

[24] Ms. Herron purports to deny Defendants' statement of facts on the basis that: (1) Ms. Caldwell's testimony "is not material" because "she was not able to remember anything significant" during the relevant period; and (2) Ms. Gertz admitted to having multiple conversations with Ms. Herron on numerous aspects of the MHA program.  Response to SOF No. 64-65 at 65-66.  However, it remains undisputed that Ms. Caldwell and Ms. Gertz testified that they could not recall any complaints or disclosures.  Ms. Herron also says that Ms. Gertz "did not realize that Fannie Mae was stalling or blocking any attempt to inform the servicers of the extension of the enrollment deadline and that [Ms. Gertz] thought Ms. Herron was 'very reasonable' in pushing back."  *Id.* at 66-67 (quoting Gertz Dep. 2 at 156-171).  If Ms. Gertz "did not realize that Fannie Mae was stalling," it cannot be that Ms. Herron made any disclosures to Ms. Gertz about this issue.  *Id.*  Ms. Gertz's later assessment in her deposition that Ms. Herron was "'very reasonable' in pushing back" is immaterial to the question of whether anyone considered Ms. Herron to be a whistleblower at the time she was terminated.  *Id.*

to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." *White v. Dep't of Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004). Finally, "'[g]ross waste of funds' is a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government." *Embree v. Dep't of Treasury*, 70 M.S.P.R. 79, 85 (1996).

Ms. Herron does not oppose these definitions or cite any other authority for alternative definitions of "gross mismanagement" or "gross waste."[25] Ms. Herron relies only on three instances which she characterizes as disclosures of Fannie Mae's gross mismanagement of the MHA program and gross waste of public funds: (1) the imposition of excessive burdens on servicers; (2) the use of stated or unverified income for trial modifications; (3) the failure to announce immediately the extension of the servicer enrollment deadline. *See* Pl. Opp'n at 41; *see also* Response to Notice of Supplemental Authority [Dkt. 160] at 1-2.

### i.    Excessive Burdens on Servicers

Ms. Herron contends that the "extra burden that Fannie Mae was imposing on servicers to chase down documentation details for individual borrowers . . . caused needless burdens on the servicers and delays in working with the borrowers." Response to SOF No. 76 at 78. She also argues "that this burden on the servicers had the potential effect of reducing the number of homeowners who could benefit from this taxpayer funded program, thereby harming

---

[25] During Ms. Herron's deposition, Defendants' counsel asked her about a definition to the terms "gross mismanagement" and "gross waste." *See* Herron Dep. 1 at 290. The questions called for a legal conclusion. As a result, the Court does not rely on her answers. In any event, Ms. Herron's subjective belief of whether Fannie Mae engaged in gross mismanagement or gross waste of public funds is not dispositive. *See Rosella*, 121 A.3d at 779. For purposes of her wrongful discharge claim under D.C. law, the relevant inquiry is whether she made disclosures of any actual gross mismanagement or waste, regardless of her belief. *See id.*

the MHA program and preventing it from achieving its statutory goals."  Pl. Opp'n at 5 (emphasis added).  This is the entirety of her argument.

Ms. Herron says that she "complained within Fannie Mae" about the excessive documentation.  *Id.* at 4.  However, Ms. Herron does not identify to whom she complained.  Ms. Herron dedicates one small paragraph of her 46-page opposition brief to this issue and she only cites her characterization of the record to support the allegation that she made protected disclosures of gross waste or mismanagement.  *See* Pl. Opp'n at 4-5 (citing Response to SOF Nos. 78, 121, 123 & 126-128).[26]  The only concrete example that Ms. Herron mentions is the conversation between her and Mr. Schuppenhauer on December 18, 2009, in which Ms. Herron "specifically told him that Fannie Mae had poor relationships with its servicers and that Treasury had corrected Fannie Mae in the past for not providing credible information to the servicers."  Response to SOF No. 121 at 115 (citing Response to SOF No. 33 at 32-33).  Ms. Herron relies on this conversation as evidence that the question of whether the additional data required from the servicers was important to the MHA program was not a debatable issue.  *See id.*

The Court fails to see how the December 18, 2009 conversation shows that the importance of the additional data to the MHA program was not a debatable issue.  Ms. Herron states nothing more than her opinion or assessment of Fannie Mae's relationships with its servicers at a time where the MHA program's administration was highly debated.  *See*

---

[26] A cursory review of Ms. Herron's responses to Defendants' proposed facts shows that Ms. Herron does not rely on the record, but rather on her own characterizations of the record.  For example, her response to SOF No. 78 cites her response to SOF No. 76.  Her responses to SOF Nos. 123, 127, and 128 cite her response to SOF No. 121, and so on.  Ms. Herron cannot cite herself to escape the record and avoid summary judgment.  As a result, Ms. Herron has failed to properly raise a genuine issue of material fact.  *See* Fed. R. Civ. P. 56.

Schuppenhauer Dep. 2 at 446 (referring to Ms. Herron's statements as her "opinion."); *see also*

Herron Dep. 2 at 452 (recognizing that there was a debate between those who did not understand

how servicers worked and those who did).  It was certainly not a disclosure of gross waste or

gross mismanagement.  *See, e.g.*, *White*, 391 F.3d at 1381 (indicated that "[m]ere differences of

opinion . . . do not rise to the level of gross mismanagement"); *Shriver*, 89 M.S.P.R. at 243

(stating that "management decisions which are merely debatable" do not constitute gross

mismanagement); *Embree*, 70 M.S.P.R. at 85 (stating that "gross waste of funds is more than a

*debatable* expenditure that is significantly out of proportion to the benefit reasonably expected to

accrue to the government") (emphasis added).

      In support of her response to SOF No. 121, Ms. Herron cites only her response to

SOF No. 33, which in turn cites a brief excerpt from Mr. Schuppenhauer's deposition.  *See*

Response to SOF No. 33 (citing Schuppenhauer Dep. 2 at 444-46).  However, Mr.

Schuppenhauer *never* testified that Ms. Herron talked to him about any "excessive burdens" that

Fannie Mae was imposing on servicers.  The December 18 conversation had nothing to do with

the alleged "excessive burdens;" it concerned Ms. Herron's disagreement with Mr.

Schuppenhauer's alleged delay in announcing the extension of the servicer enrollment deadline.

*See* Schuppenhauer Dep. 2 at 446 (Ms. Herron's counsel stated, "But in any case, you do recall

that she gave some indication to you of why she thought [the announcement of the extension]

should be in writing from Fannie Mae as an official announcement."); *see* Response to SOF No.

33 at 32 (noting that during the December 18 conversation, Ms. Herron "reiterated the need to

notify the servicers of the new enrollment deadline . . . .").  Ms. Herron also improperly quotes

her lawyer's leading questions at the deposition as evidence of Mr. Schuppenhauer's testimony,

when in fact Mr. Schuppenhauer testified multiple times that he could not recall exactly what

Ms. Herron told him.  ("I don't know if she said those exact words . . . I don't remember the articulation that you just stated  . . . I seem to recall something, but I don't recall the words that you stated . . . I seem to recall something along those lines in her opinion . . . .").  Since the conversation did not address the supposed "excessive burdens" of requesting additional documentation, Ms. Herron's reliance on it is inapposite.

Furthermore, Ms. Herron testified at her deposition that some Fannie Mae employees lacked experience and were demanding additional information from the servicers, which was "overly burdensome and wasn't going to get to the goal that they were supposedly pushing for."  Herron Dep. 2 at 452.  She also cites a December 2010 report by the Congressional Oversight Panel as evidence confirming the validity of Ms. Herron's protests.  *See* Congressional Oversight Panel "December Oversight Report: A Review of Treasury's Foreclosure Prevention Programs" at 51 & n.145 (Dec. 14, 2010) (excerpts attached as Ex. 9 to Response to SOF) (stating that "Treasury noted that servicers might exit due to . . . the costs of participating in HAMP (e.g., labor and time needed to complete additional paperwork)").  Ms. Herron does not cite any evidence that she told someone about the conduct that she characterizes as "overly burdensome."  Herron Dep. 2 at 452.   A disclosure of gross waste or mismanagement must be made by "the statements . . . in the [plaintiff's] complaint to a supervisor or to a public body, not [her] subsequent characterization of those statements in litigation."  *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (D.C. 2008) (internal quotation marks and quotation omitted).  Ms. Herron's characterization of her criticisms after she was terminated is immaterial to a determination of whether there was a close fit between the claimed public policy and the conduct leading to the alleged wrongful termination.

Similarly, there is no evidence that Ms. Herron's vague criticism of the "excessive burdens" on servicers revealed any gross waste or mismanagement.  In her opposition, Ms. Herron says that the alleged burdens "had the *potential effect* of reducing the number of homeowners who could benefit from this taxpayer funded program."  Pl. Opp'n at 5 (emphasis added).  Even if Ms. Herron made any disclosures on this issue (for which there is no evidence), the "potential effect" of reducing the number of participating homeowners is simply too attenuated to constitute a disclosure of gross waste or mismanagement.  *Id.*  In conclusion, Ms. Herron has failed to produce any evidence indicating that her alleged criticism of the imposition of excessive burdens violated her claimed public policy.

### ii. Use of Stated Trial Modifications

Ms. Herron identified various problems with Fannie Mae's processing of trial modifications under HAMP.  Specifically, Ms. Herron opined that Fannie Mae's reliance on a homeowners' stated income instead of verified income when processing trial modifications was improper.  Ms. Herron favored a verified trial process in which Fannie Mae would ask homeowners to provide proof of income so that their eligibility for trial modifications could be properly evaluated.  Among the "observations" that Ms. Herron made about the trial modification process were: (1) the fact that between 55-65% of the trial modifications converted to permanent modifications; and (2) the conversion range was lower than expected because the trial modification process included borrowers "who were not eligible for the program from the onset . . . or who were not interested in staying in their homes."  *See* Trial Modification E-mail. She also commented that many servicers went with stated trial modifications because of the pressure to reach trial targets.  *Id.*

54

Ms. Herron argues that "beginning on November 12, 2009, and continuing through the rest of her employment, [she] disclosed to Treasury in writing and orally to Ms. Gertz (and complained within Fannie Mae) that the trial modification program was a failure because it relied on stated (unverified) income, instead of relying upon verified income documentation."  Pl. Opp'n at 41.  To the contrary, there is not a scintilla of evidence in the briefs or in the entire record of any "disclosure" on the issue of trial modifications beyond Ms. Herron's November 12, 2009 e-mail to Fannie Mae managers.  *See* Trial Modification E-mail. The only time that Ms. Herron refers to her criticisms of the trial modification process was in a section titled "Ms. Herron's *November 12, 2009 Disclosures* About Trial Modifications."  Pl. Opp'n at 5-6 (emphasis added).

Ms. Herron's assertion that she disclosed her criticisms to Ms. Gertz at Treasury is equally unsupported.  Ms. Herron's counsel asked Ms. Gertz at her deposition whether she had "any conversations with Ms. Herron about [the] fact . . . [t]hat trial modifications were not converted to permanent modifications."  Gertz Dep. 1 at 30.  Ms. Gertz testified that she could not "recall specific conversations, although Ms. Herron and I certainly talked about the programs in general."  *Id.*; *see also id.* at 31-35.  In response to direct questions about Ms. Herron's November 12, 2009 E-mail, Ms. Gertz testified that she could not recall receiving the e-mail. *See id.* at 31.  Ms. Gertz also stated, "I don't recall a specific e-mail, although many people, possibly including Ms. Herron, had concluded that not having verified documents was an issue." *Id.*  The record shows that Ms. Herron sent the November 12, 2009 e-mail only to Fannie Mae managers and did not copy Ms. Gertz.  *See* Trial Modification E-mail.  Ms. Caldwell also testified that she could not recall Ms. Herron's criticisms on using unverified income for trial modifications.  In conclusion, aside from Ms. Herron's own statements, there is no evidence in

the record that Ms. Herron disclosed to Ms. Gertz (or anyone at Treasury) anything about the trial modification process.[27]

Further, Ms. Herron's criticism of the trial modification process was not a disclosure because others at Fannie Mae and Treasury already knew about the problems associated with the use of homeowners' stated income. For example, on June 9, 2009, there was a meeting between Ms. Brown and Treasury officials. In an e-mail containing the minutes of the meeting, Ms. Brown stated that "servicers have learned that the fallout rate due to stated income borrower's document deficiencies are resulting in significant processing inefficiencies." Defs. MSJ R., Ex. 38 [Dkt. 146-55] (June 9 Meeting). Ms. Brown also said that "[t]he need for stated income may not be as great today." *Id.* This meeting took place before Ms. Herron started working as a Fannie Mae contractor.

It is no surprise, then, why Ms. Gertz testified that "many people, possibly including Ms. Herron, had concluded that not having verified documents was an issue." Gertz Dep. 1 at 31. Ms. Caldwell testified to the same effect at her deposition: "I can say from the time I joined Treasury [in early November 2009] until even to the present, . . .that's a point of debate" — referring to the "debate" of "whether or not there should be stated modifications or verified

---

[27] In response to Defendants' proposed fact No. 92 — namely, that Ms. Gertz did not recall a specific instance in which Ms. Herron discussed her criticisms of the trial modification process — Ms. Herron wrote "[d]enied" and cited her response to SOF No. 64. Response to SOF No. 92 at 95 (citing Response to SOF No. 64 at 65-66). However, Ms. Herron's response to SOF No. 64 referred only to Ms. Caldwell's testimony and did not mention Ms. Gertz. To the extent that Ms. Herron meant to cite her response to SOF No. 65, which did mention Ms. Gertz, it still did not address the relevant issue of Ms. Herron's criticism of the trial modification process. *See* Response to SOF No. 65 at 66-67 (addressing exclusively Ms. Herron's comments regarding the extension of the servicers' enrollment deadline). Accordingly, Ms. Herron has not shown the existence of a genuine issue of material fact on this point. *See* Fed. R. Civ. P. 56(c).

modification[s]." Caldwell Dep. 1 at 82. The information regarding the conversion rate was widely known and "very transparent." *Id.* at 230-32; *see also id.* at 164. It is also undisputed that Herb Allison, Fannie Mae's former CEO and Assistant Secretary for Financial Stability at Treasury, learned about the servicers' desire to conduct a verified income trial process directly from the servicers and not from Ms. Herron. *See, e.g.*, Compl. ¶ 46; Herron Dep. 1 at 543.[28]

In addition to Treasury officials, Fannie Mae managers were fully aware of the conversion rate and the problems with the trial modification process. For example, Mr. McGhee stated at his deposition, "I don't remember [Ms. Herron] specifically raising [the 'issue' of whether the 'goal should be changed . . . to verified income trials rather than stated income trials']. But that was, like I said before, an active debate. And there were -- I would argue there was probably just as many people on each side of that argument." McGhee Dep. at 70. Similarly, in response to Ms. Herron's November 12, 2009 e-mail, Ms. Brown replied, "This is great! *The good news here is nothing new reported.* Now we need to get some of the proposals for change done (like policy on moving to verified trials)." Defs. MSJ R., Ex. 39 [Dkt. 146-56] (emphasis added). Since Treasury and Fannie Mae officials were already aware of the problem, then there was nothing for Ms. Herron to disclose. *See Wilburn*, 957 A.2d at 925-26 (citing

---

[28] Ms. Herron purports to deny this fact by injecting extraneous, immaterial facts, such as: (1) "Mr. Allison's observations, standing alone, were not enough to lead a change in the program" absent Fannie Mae's pressure; and (2) Mr. Allison, unlike Ms. Herron, did not advocate for a change in policy. Response to SOF No. 94 at 95. Not only are these assertions immaterial to question of whether Mr. Allison independently learned of the problem from the servicers, but also, Ms. Herron does not cite anything in the record to support them. *See id.* Arguing that Ms. Herron advocated for a change in policy does not advance her cause. The issue is not who favored or disfavored a change in policy concerning trial modifications, but rather, whether Ms. Herron *disclosed* gross waste or mismanagement, which is the claimed public policy that would allow her suit.

*Meuwissen v. Dep't of the Interior,* 234 F.3d 9, 13 (Fed. Cir. 2000) (reasoning that "[a]

disclosure of information that is publicly known is not a disclosure" because the employee has

not revealed any "knowledge of wrongdoing that is concealed. . . ."); *Clarke v. Multnomah Cnty.,*

06-cv-229 (HU), 2007 WL 915175, at *16-17, (D. Or. Mar. 23, 2007) (finding that plaintiff's

statements were not protected disclosures because "any of the communications for which

plaintiff says she was retaliated against related to topics or issues already known to either the

persons she reported to, or at least to other supervisory persons within the County.")).[29]

Thus, even if Ms. Herron's November 12, 2009 e-mail were a protected

disclosure, she did not reveal any gross mismanagement or waste of public funds by Fannie Mae.

The issue concerning the conversion rate of stated trial modifications was a highly debated topic

in the midst of a complex effort to address the collapse of the housing market. *See, e.g.*,

Caldwell Dep. 1 at 82; McGhee Dep. at 70. Ms. Herron joined the side of those recommending a

switch to verified income trial modifications. In expressing her opinion "as to the proper

approach to a particular problem or the most appropriate course of action," she failed to disclose

any gross mismanagement. *White*, 391 F.3d at 1381; *see also Shriver*, 89 M.S.P.R. at 243.

Finally, Ms. Herron did not disclose that Fannie Mae was responsible for the

gross waste of public funds because the servicers, not Fannie Mae, were the ones who initiated

"the actual . . . modification process with the borrower" and who used the homeowners' stated

---

[29] The Court also notes that, on December 2, 2009, — three weeks after Ms. Herron's e-mail and prior to her termination — Fannie Mae sent a "Briefing Paper" to Treasury recognizing the need to "move to a documented process prior to trial modification start, or, at a minimum, encourage servicers to verify income documentation before initiating trial modification." Defs. MSJ R., Ex. 41 [Dkt. 146-58]. On January 28, 2010, Treasury issued new guidance to servicers directing them to move from stated to verified trial modifications by no later than June 1, 2010.

income to process the trial modifications.  Herron Dep. 1 at 392-93.  Similarly, Treasury, not

Fannie Mae, "set a goal of 500,000 trial modifications by November 1, 2009."  Defs. MSJ R.,

Ex. 3 [Dkt. 146-20] (TARP Report) at 65.  Servicers used homeowners' stated income because

Treasury allowed it.  *Id.* at 66. ("When the program launched in May 2009, servicers were

explicitly provided flexibility to approve borrowers for trial modifications without

documentation of income in order to reach more borrowers more quickly.").  Even if Fannie Mae

pushed servicers to meet the annual goal by using the homeowners' stated income, it did so

pursuant to Treasury's guidance and the government's goal of reaching as many borrowers as

possible.  *See id.*; *see also* McGhee Dep. at 70.[30]

       "This approach was intended to provide more immediate relief and allow

[HAMP] to meet pent-up demand for modifications after two years of crisis conditions, 'buy

time' for many homeowners to find permanent solutions outside of the foreclosure process and

facilitate housing market-stabilization."  TARP Report at 66.  Ultimately, Treasury, not Fannie

Mae, was responsible for deciding whether to require servicers to use verified trial modifications.

This is why, "[o]n January 28, 2010, Treasury issued a new guidance requiring servicers to begin

collecting documents upfront no later than June 1, 2010."  *Id.* at 67.

---

[30] Ms. Herron denies the fact that servicers where the ones that handled the trial modification
process and that Treasury was the one that set the goals of trial modifications.  *See* Response to
SOF No. 81-82 at 81-84.  This denial is contradicted by the record, *see* TARP Report and Herron
Dep. 1 at 405-06, and none of the depositions supports Ms. Herron's position.  Ms. Herron cites
the deposition testimony of Mr. Schuppenhauer, Ms. Brown, and Mr. Williams, which merely
indicate that Fannie Mae pushed servicers to meet the annual goal of trial modifications.  There
is no evidence in the record showing that Fannie Mae set the annual goal or that it handled the
trial modification process.  Ms. Herron's denial fails to dispute these facts.  *See* Fed. R. Civ. P.
56(c).

In her November 12, 2009 e-mail, Ms. Herron complained that many servicers went with stated trial modifications due to the pressure of meeting the goal of trial targets — a goal established by Treasury.  *See* Trial Modification E-mail; *see also* TARP Report at 65.  As a result, assuming *arguendo* there was a gross waste of funds resulting from the use of stated trial modifications, such waste would be directly attributed to Treasury.  Notably, Ms. Herron's e-mail made no reference to public funds, let alone a gross waste of such funds.  The fact that Treasury set a high goal and allowed servicers to use stated income trials to provide immediate relief and buy time for many homeowners to find permanent solutions demonstrates that Ms. Herron criticized a "debatable expenditure" and not a gross waste of public funds.  *Embree*, 70 M.S.P.R. at 85.  As a result, there is not a close fit between Ms. Herron's criticism of the use of stated trials and her claimed public policy of disclosing Fannie Mae's gross mismanagement or waste of funds.

### iii.    Extension of Servicer Enrollment Deadline

Ms. Herron's last criticism of Fannie Mae was that Defendants failed to announce the extension of the servicers' enrollment deadline immediately.  Ms. Herron claims that "from December 11, 2009 onwards, [she] repeatedly disclosed to Treasury that defendants were refusing to post any announcement of the extension of the servicer enrollment deadline, despite clear direction from Treasury that this extension was to be promptly and publicly announced."  Pl. Opp'n at 41.  Defendants contend that this assertion is unsupported by the record.

Ms. Herron was relentless in pressuring Defendants to announce the extension immediately.  However, there is no evidence that Treasury directed Fannie Mae to publicize the extension at a particular time or in a specific manner.  While Ms. Herron claims that Fannie Mae ignored Treasury's "clear" directive, the evidence adduced does not reveal any such clarity.  Ms.

Herron relies on the following evidence to support her position: (1) Mr. Williams's testimony that Fannie Mae had the duty to inform servicers about changes in Treasury policy, *see* Williams Dep. 1 at 305-07; (2) Ms. Caldwell's statements that, "I would want people to . . . have time, but we would want them to do it correctly" and "not wanting to . . . push[] people to do something when you know a deadline is going to be extended . . . .," *see* Pl. Opp'n, Ex. Caldwell Dep. [Dkt. 151-8] (Caldwell Dep. 2) at 127, 199;[31] and (3) Ms. Gertz's statement, "I believe that the program — yes, that servicers needed to have confidence in the administration of the program" and "Fannie's overall performance would reflect on the administration of the program," which "would include providing correct information," *see* Gertz Dep. 2 at 113-114.  Pl. Opp'n, Statement of Disputed Facts [Dkt. 151-3] (Disputed Facts) No. 1 at 4.

None of these statements shows that there was a "clear directi[ve] from Treasury that this extension was to be promptly and publicly announced."  Pl. Opp'n at 41.  In fact, it is undisputed that Ms. Gertz and Ms. Caldwell testified that they could not recall anyone at Treasury ordering Fannie Mae or Mr. Schuppenhauer when and how to publicize the extension. *See* Caldwell Dep. 1 at 107, 127-28; Gertz Dep. 1 at 286.  Ms. Caldwell testified that if there were such a directive, she would have had to sign off on it and she did not.  *See* Caldwell Dep. 1 at 202.  Moreover, on December 14, 2009, Ms. Caldwell told Ms. Herron that Treasury was

---

[31] Ms. Herron omits a critical part of Ms. Caldwell's testimony, which is obvious from a review of the cited materials.  Ms. Caldwell's full answer was, "[O]*n a personal level*, thinking back on the time, there's a *balance* between not wanting to — again, *just my own way of how I would do business with people*, pushing people to do something when you know a deadline is going to be extended, *at the same time not giving people who are capable of doing something artificially more time to do it*."  Caldwell Dep. 2 at 199 (emphasis added).  Ms. Caldwell emphasized several times that she was not stating Treasury's official policy, but only her personal view of how to do business with people.  She also testified that in deciding when to make an announcement, she would have balanced these two competing interests.

"confirming with counsel" on how to publicize the extension.  Herron to Caldwell December 14

E-mail.  There is no evidence that Ms. Caldwell or anyone at Treasury got back to Ms. Herron

with a strategy or directive approved by counsel.

Similarly, on December 18, 2009, Ms. Gertz wrote an e-mail to Mr.

Schuppenhauer and other Fannie Mae managers stating: "While I understand that we are trying

to get as many servicers as possible to sign up before year end, I don't think there's a reason to

force them (or us) to that deadline.  Not sure how it will look they jump through hoops to get

there before 12/31 and then we announce the extension.  *Thoughts?*"  Gertz to Schuppenhauer

December 18 E-mail (emphasis added).  Mr. Schuppenhauer quickly responded to Ms. Gertz and

Ms. Caldwell that Fannie Mae was working on the announcement, but that he thought that the

communication should be kept "fairly low key."  *Id.*  No one at Treasury responded to Mr.

Schuppenhauer's e-mail.  *Id.*

After several internal conversations and communications with Treasury officials,

Fannie Mae posted the announcement on the registration page of the HAMP website on

December 22, 2009 — only twelve days after Ms. Herron first inquired about the extension and

seven days after Ms. Gertz confirmed to Ms. Herron that the extension was official.  The Court

fails to see how Ms. Herron's persistence contained a disclosure of gross waste or

mismanagement instead of strenuous disagreement with her managers.  There was a debate on

when to announce the deadline extension and there were legitimate reasons behind Mr.

Schuppenhauer's "below the radar" approach.  Gertz to Herron December 15-16 E-mail.  Ms.

Caldwell testified to the two competing interests.  Caldwell Dep. 1 at 185.  On the one hand,

there was the "courtesy" of communicating the extension to the servicers "before they rushed to

meet a deadline" during the holidays.  *Id.*  On the other hand, Treasury's goal was "to get people

in the door," that is, to increase the number of enrolled servicers so that more homeowners could benefit from the trial modification process. *Id.* Ms. Caldwell also testified that the decision of "how [to] publicize [the extension] would have been a judgment call . . . ." *Id.* at 186. Similarly, the TARP Report stated that HAMP's goal was to provide "immediate relief" and "meet pent-up demand for modifications," which could only be done by increasing the number of servicers enrolled in the program. TARP Report at 66. For this reason, Ms. Caldwell testified that she favored a "more nuanced response" to announcing the extension. Caldwell Dep. 1 at 186.

The Court need not decide whether the more "nuanced" or "below the radar" approach was the best alternative. It was a debatable point as to which Ms. Herron expressed her strong opinion. *See* Herron Dep. 1 at 170-71. The decision of when and how to publicize the extension was a "judgment call" not subject to any clear directive by Treasury.[32] Caldwell Dep. 1 at 186. Ms. Herron pressured Fannie Mae to make a broadcast announcement to all servicers, not because Treasury ordered it, but rather because she personally thought that "it was what needed to be done." Herron Dep. 1 at 169. Ms. Herron's criticism of Defendants' stance on this matter was not a disclosure of gross mismanagement, but just a strong disagreement with senior managers as to the more appropriate course of action. *White*, 391 F.3d at 1381.

Ms. Herron also alleges that she disclosed a gross waste of public funds. At her deposition, Ms. Herron criticized the fact that Defendants were "not getting timely and accurate

---

[32] Ms. Herron claims "[i]t is disputed whether Fannie Mae timely announced the extension of the servicer enrollment deadline, so that servicers would be adequately informed before the end of 2009, or whether Fannie Mae made the announcement in a sufficiently public manner." Disputed Fact No. 1 at 3. To the extent that these issues are truly disputed, they are immaterial because there was no Treasury directive and the issue of when and how to publicize was open to discussion between officials at Treasury and Fannie Mae.

information out about the program, and the motives behind it was it's getting more servicers

signed up so they could get their incentives and get their numbers up."  Herron Dep. 1 at 170.

However, none of Ms. Herron's e-mails or communications to Treasury officials and her

colleagues at Fannie Mae referenced public funds.  In fact, Ms. Herron only expressed that

servicers would have to work their staffs during the holiday without knowing that the enrollment

deadline had been extended.  *See* Bryar to Herron December 16 E-mail.  Ms. Herron believed

that this would affect Fannie Mae's credibility and its relationship with servicers.  *See id.*  She

expressed the same concern to Mr. Schuppenhauer during their December 18, 2009 conversation.

A gross waste of funds was never a concern that she articulated before she was deposed.

Because a "disclosure" of gross waste or mismanagement is based on the "statements  . . . [made]

to a supervisor or to a public body, not [her] subsequent characterization of those statements in

litigation," it follows that Ms. Herron did not disclose Fannie Mae's alleged gross waste of

taxpayer funds.  *See Wilburn*, 957 A.2d at 925 (internal quotation marks and citation omitted).

Finally, even if Fannie Mae officials received incentive payments and bonuses

based on, *inter alia*, the number of enrolled servicers and permanent modifications at the end of

2009, these incentives were both determined and approved by Treasury.  *See* Pl. Opp'n, Ex.

Williams Dep. [Dkt. 151-25] (Williams Dep. 2), Ex. 4 (Financial Agency Agreement).  Fannie

Mae's motivation to hit Treasury's annual trial targets is irrelevant.  In this particular case, the

performance incentive payments were directly linked to the fact that Treasury and Fannie Mae

needed the servicers to enroll in HAMP so that homeowners could modify their mortgage

payments.  Consequently, Ms. Herron has not shown that Fannie Mae's short delay in

announcing the extension was more than a "debatable expenditure."  *Embree*, 70 M.S.P.R. at 85.

This is particularly true considering that Fannie Mae posted the announcement on the HAMP

website and came up with a plan to directly alert those servicers that were "looking to work through the holiday weekend . . . ." Kanefield December 17 E-mail.  In the instant case, "it is absurd to contend that whenever an employee [or a contractor, such as Ms. Herron] expresses frustration about the scope of information-sharing or the pace of decision-making in a large [company, such as Fannie Mae], that employee [or contractor] becomes a whistleblower insulated to a significant degree from adverse personnel actions." *See Rodriguez v. District of Columbia*, 2013 WL 5497979, at *12 (D.C. Super. Aug. 20, 2013) (citation omitted).

In conclusion, Ms. Herron has failed to establish a close fit between her claimed public policy in the Stabilization Act and her criticisms of Fannie Mae's practices. *See Carl*, 702 A.2d at 164.  Ms. Herron did not make any disclosures of gross mismanagement or waste of public funds and, therefore, may not benefit from the public policy exception to the at-will employment doctrine.  The Court need not address the parties' remaining arguments regarding the potential conflict of interest concerns and the cause of Ms. Herron's termination.[33] Summary judgment will be entered in favor of Defendants on the wrongful termination claim.

### C.  Civil Conspiracy Claim

Lastly, "[a] civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act.'" *McMillian v. District of Columbia*, 466 F. Supp. 2d 219, 233 (D.D.C. 2006) (quotation and internal quotation marks omitted).  To prevail on her civil conspiracy claim, Ms. Herron must establish the following four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an

---

[33] As a result, Ms. Herron's motion for partial summary judgment on Defendants' tenth affirmative defense will be denied as moot.

unlawful manner, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison,* 637 A.2d 830, 848 (D.C. 1994) (citing *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983)).  Moreover, "civil conspiracy depends on the performance of some underlying tortious act.  It is thus not an independent action; it is, rather, a means for establishing vicarious liability for the underlying tort."  *Id.*; *see also Daisley*, 372 F. Supp. 2d at 73 (citations omitted).

Since Ms. Herron has failed to establish a cognizable underlying tort — namely, an intentional interference claim or a wrongful termination claim — it follows that summary judgment will be entered in Defendants' favor on Ms. Herron's civil conspiracy claim.  The Court need not address the parties' remaining arguments regarding the involvement of the individual Defendants and the applicability of the intra-corporate conspiracy doctrine.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment, Dkt. 145, and deny Ms. Herron's Motion for Partial Summary Judgment, Dkt. 147, as moot.  Judgment will be entered in favor of Defendants.  A memorializing Order accompanies this Memorandum Opinion.

Date: March 8, 2016

                                    /s/
                              ROSEMARY M. COLLYER
                              United States District Judge